### 3.    Post Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

## I.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

- The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to (a) the Debtors; and (b) the Required Plan Modification Agents.

### 2.    Conditions Precedent to Consummation

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

- The Confirmation Order shall be a Final Order in form and substance acceptable to (a) the Debtors; and (b) the Required Plan Modification Agents.

- The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be acceptable to:  (a) the Debtors; and (b) the Required Plan Modification Agents.

- The Exit Facility, the New Term Loan Credit Agreement, and the HoldCo Loan Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

- All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

### 3.    Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article X of the Plan may be waived only by consent of:  (a) the Debtors; and (b) the Required Plan Modification Agents.

### 4.    Effective Date

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article X.B of the Plan have been satisfied or waived.

### 5.    Effect of Non-Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any

other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## J.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 1.    Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan; provided that such modifications shall be subject to the consent of the Required Plan Modification Agents. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

### 2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## K.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is

assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.  Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.  Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.  Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.  Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 of the Plan;

14.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.  Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.  Adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.  Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.  Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.  Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.    Enforce all orders previously entered by the Bankruptcy Court;

23.    Hear any other matter not inconsistent with the Bankruptcy Code; and

24.    Enter an order concluding or closing the Chapter 11 Cases.

## L.    MISCELLANEOUS PROVISIONS

### 1.    Immediate Binding Effect

Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3.    Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### 4.    Dissolution of Committees

On the Effective Date, the Committees, if any, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 5.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 6.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

7.    **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Source Interlink Companies, Inc.                      Kirkland & Ellis LLP
Attn: Legal Department                      Attn: David L. Eaton and David A. Agay
27500 Riverview Center Boulevard, Suite 400                      300 North LaSalle Drive
Bonita Springs, Florida 34134-4325                      Chicago, Illinois 60654-3406

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

8.    **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

9.    **Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

10.    **Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without (a) the Debtors' consent and (b) the consent of the Required Plan Modification Agents; and (3) nonseverable and mutually dependent.

**ARTICLE V
SOLICITATION AND VOTING PROCEDURES**

The following summarizes briefly the procedures to accept or reject the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

A.    **THE SOLICITATION PACKAGE**

The following materials constitute the Solicitation Package:

- the appropriate Ballots and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

45

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

The voting class, Class 4, entitled to vote to accept or reject the Plan shall be served by email or with paper copies of this Disclosure Statement with all exhibits, including the Plan. Any party who desires additional paper copies of these documents may request copies from the Voting Agent by writing to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or calling (310) 751-1797. The Solicitation Package (except the Ballots) can also be obtained by accessing the secure Intralinks hosted by the Term Loan Administrative Agent. All parties entitled to vote to accept or reject the Plan shall receive by email, or a paper copy of, each appropriate Ballot.

The Plan Supplement will be Filed no later than fourteen days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court. The Plan Supplement will include the following: (1) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (2) a list of Executory Contracts and Unexpired Leases to be rejected; (3) a schedule of Causes of Action to be retained by the Reorganized Debtors; (4) the form of the Exit Facility Agreement and the Exit Facility Documents; (5) the form of the New Term Loan Credit Agreement; and (6) the form of the Shareholders Agreement. The Company may subsequently amend, supplement, modify or add additional items to the Plan Supplement, which will also be Filed.

## B.    VOTING DEADLINE

The period during which Ballots with respect to the Plan will be accepted by the Company will terminate at 5:00 p.m. (prevailing Eastern Time) on **April 27, 2009**, unless the Company, in its sole discretion, extends the date until which ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

## C.    VOTING INSTRUCTIONS

Only the Holders of Allowed Class 4 Term Loan Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them by facsimile, email, or in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan. Voting Instructions are attached to each Ballot.

The Company is providing the Solicitation Package to Holders of Term Loan Claims whose names appear as of the Voting Record Date in the records maintained by the Company.

The Company, has engaged KCC as the Voting Agent to assist in the balloting and tabulation process. KCC will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable on or after the Petition Date.

The deadline by which KCC must receive your Ballot is 5:00 p.m. (prevailing Eastern Time) on **April 27, 2009.**

---

### BALLOTS

1. Ballots must be actually received by KCC by the Voting Deadline.

2. Sign and return the Ballot by facsimile to (310) 751-1847 or by email to KCC_SourceInterlink@kccllc.com.

3. Please also send your original, completed Ballot in the return envelope provided via overnight delivery.

4. Ballots to be returned directly to KCC may also be sent by First Class Mail, Overnight Courier, or Personal Delivery to:

**Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**Attn: Source Interlink Tabulation**

If you have any questions on the procedures for voting on the Plan, please call KCC at the following telephone number:

**(310) 751-1797**

---

**Any Ballot that is properly executed by the Holder of a Term Loan Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 4 Term Loan Claim must vote all of its Term Loan Claims within Plan Class 4 either to accept or reject the Plan and may not split its votes. By signing and returning a ballot, each Holder of a Term Loan Claim in Class 4 will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Term Loan Claim have been cast or, if any other Ballots have been cast with respect to such Term Loan Claim, such other Ballots are revoked.**

**All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.**

By signing and returning a Ballot, each Holder of a Term Loan Claim in Class 4 will be certifying to the Bankruptcy Court and the Company that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder is or is not an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act;

- the Holder has cast the same vote with respect to all Claims in Class 4; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked.

**D.    VOTING TABULATION**

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim or Equity Interest. Only Holders of Claims in the voting classes shall be entitled to vote with regard to such Claims.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to KCC is at the election and risk of each Holder of a Term Loan Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when KCC actually receives the original executed Ballot or actually receives the executed Ballot by fax or email as instructed in the Voting Instructions. No Ballot should be sent to the Company, the Company's agents (other than KCC), or the Company's financial or legal advisors. The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Term Loan Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Term Loan Claims within Plan Class 4 either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Term Loan Claims within Class 4, the Company may, in their discretion, and to the extent possible, aggregate the Term Loan Claims of any particular Holder within Class 4 for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Company will File with the Bankruptcy Court, on the Petition Date, or as soon as practicable thereafter, the Voting Report prepared by KCC. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. KCC will attempt to reconcile the amount of any Class 4 Term Loan Claim reported on a Ballot with the registry of the Term Loan Administrative Agent, but in the event such amount cannot be timely reconciled without undue effort on the part of KCC, the amount shown in the Term Loan Administrative Agent's registry shall govern. The Voting Report also shall indicate the Company's intentions with regard to such Irregular Ballots. Neither the Company nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

**ARTICLE VI**
**VALUATION ANALYSIS AND FINANCIAL PROJECTIONS**

**A.    VALUATION OF THE REORGANIZED DEBTORS**

**1.    Introduction**

In conjunction with formulating the Plan, the Debtors have determined that it is appropriate to estimate a post Confirmation going concern value for the Reorganized Debtors (the "Estimated Reorganized Debtors' Enterprise Value"). Accordingly, the Debtors have directed Moelis & Company, LLC ("Moelis") to prepare such a valuation. The valuation is being prepared solely by Moelis at the direction of the Debtors.

2.    **Valuation**

Moelis estimates the Estimated Reorganized Debtors' Enterprise Value to be between approximately $737 million to $865 million, with a midpoint of $800 million as of June 30, 2009, which is the assumed Plan Effective Date for purposes of valuation. The values are based upon information available to, and analyses undertaken by, Moelis as of April 23, 2009. It should be understood that, although subsequent developments may affect Moelis' conclusions, Moelis does not have any obligation to update, revise or reaffirm its estimate.

The foregoing valuation reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances pursuant to the Plan on June 30, 2009, the amount of available cash, market conditions, the availability of certain tax attributes and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein and is based on Projections (as defined below) provided by the Debtors to Moelis for fiscal years 2010-2014 in both a base case and an alternative case with more conservative assumptions regarding general economic conditions in the future.

Moelis assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Moelis' Estimated Reorganized Debtors' Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins and cash flow, as projected. If the businesses perform at levels below those set forth in the Projections, such performance may have a materially negative impact on the Estimated Reorganized Debtors' Enterprise Value. Conversely, if the businesses perform at levels above those set forth in the Projections, such performance may have a materially positive impact on the Estimated Reorganized Debtors' Enterprise Value.

Given the uncertainty prevailing in the current markets, the analysis takes into consideration both the base case and the more conservative scenario of the Projections prepared by the Debtors.

The estimates of value set forth herein represent hypothetical enterprise values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the trading value or sale of any securities to be issued pursuant to the Plan, which may be significantly different than any values implied by the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of operating businesses such as the Debtors' businesses are subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

In preparing the Estimated Reorganized Debtors' Enterprise Value, Moelis: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections developed by management relating to their businesses and prospects; (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the values of public companies deemed generally comparable to the operating businesses of the Debtors; (e) considered certain economic and industry information relevant to the Debtors' operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Moelis conducted a review and analysis of the Debtors' businesses, operating assets and liabilities and business plans, Moelis relied on the accuracy and completeness of all: (i) financial and other information furnished to it by the Debtors, including the Projections, and (ii) publicly available information. In addition, Moelis did not independently verify the Projections in connection with preparing the estimates of value set forth herein, and no independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

Moelis' estimates of value set forth herein do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimates of value set forth herein do not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

49

### B.    VALUATION METHODOLOGIES

In performing its analysis, Moelis used comparable public companies trading multiples, precedent M&A transactions multiples and discounted cash flow methodologies. These valuation techniques reflect both the market's current view of the Debtors' strategic plan and operations, as well as a longer-term focus on the intrinsic value of the cash flow associated with the Debtors' current strategic initiatives. Moelis made judgments as to the significance of each analysis in determining the Estimated Reorganized Debtors' Enterprise Value range. In performing the financial analyses described below and certain other relevant procedures, Moelis reviewed significant assumptions with the management of the Debtors. Moelis' valuation analysis must be considered as a whole.

**THE FOLLOWING SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES AND FACTORS UNDERTAKEN TO SUPPORT MOELIS' CONCLUSIONS. THE PREPARATION OF A VALUATION IS A COMPLEX PROCESS INVOLVING VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE ANALYSES AND FACTORS TO CONSIDER, AS WELL AS THE APPLICATION OF THOSE ANALYSES AND FACTORS UNDER THE PARTICULAR CIRCUMSTANCES. AS A RESULT, THE PROCESS INVOLVED IN PREPARING A VALUATION IS NOT READILY SUMMARIZED.**

### 1.    Comparable Company Analysis

The comparable company valuation analysis is based on the enterprise values of publicly traded companies that have operating and financial characteristics similar to the Debtors. Under this methodology, numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of the specific analysis entailed comparing the enterprise value (defined as market value of equity plus book value of debt, book value of preferred stock and minority interests less cash) for each comparable company to their projected EBITDA. These multiples were calculated on or around the date of this Disclosure Statement and were then applied to the Debtors' Projections to determine the range of enterprise values using this methodology.

A key factor to this approach is the selection of companies with relatively similar businesses and operational characteristics to the Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of business, business risks, growth prospects, market presence and size and scale of operations. The selection of appropriate comparable companies is often a matter of judgment and subject to limitations due to sample size and the availability of meaningful market-based information. The lack of publicly traded pure-play magazine publishers and media distributors makes the selection of appropriate comparable companies for the Debtors challenging. The most relevant and comparable companies to the Debtors are either not publicly traded or are divisions of publicly traded companies whose operations and financial reporting include other less comparable lines of business.

### 2.    Precedent Transactions Analysis

The precedent M&A transaction analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Debtors. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. The enterprise value is then applied to the target's last twelve month EBITDA prior to the transaction announcement date to calculate EBITDA multiples. These multiples were then applied to the Debtors' Projections to determine the implied range of enterprise value using this methodology.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in a company's assets). Thus, this methodology generally produces higher valuations than the comparable public company analysis. In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (i.e., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; (c) the sale of a discrete asset or segment may warrant a discount or premium to the sale of an entire company depending on the specific operational circumstances of the seller and acquirer; and (d) circumstances pertaining to

50

the financial position of the company may have an impact on the resulting purchase price (i.e., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

Moelis evaluated various merger and acquisition transactions that have occurred in the magazine publishing industry and the distribution industry over the past eight years. Over that time period, there were a limited number of precedent M&A transactions, and of those that are relevant, limited financial information was disclosed. In addition, many of these transactions occurred under materially different capital market and operating conditions from those prevailing currently. In such cases, these considerations significantly reduced the relevance of the precedent M&A transaction analysis.

### 3.    Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF approach takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF approach is that debt-free, after-tax cash flows are estimated for a projection period and a terminal value is estimated to determine going concern value of the subject company from the end of the projection period forward. These cash flows are then discounted at an appropriate weighted average cost of capital, which is determined by referring to, among other things the average cost of debt and equity for the selected comparable companies. In this case, Moelis used the five-year projection period through fiscal year 2014.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Debtors' Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Due to the level of uncertainty facing the Debtors' long-term operations during the five-year projection period, Moelis also considered an alternative case of Projections prepared by the Debtors with more conservative assumptions regarding general economic conditions in the future to best reach a conclusion for the implied range of enterprise values using this methodology.

### 4.    Other Asset Valuation

Moelis also took into consideration the Debtors' expected tax attributes post emergence, such as the Company's net operating losses ("NOLs"). Per the Company's guidance, the valuation analysis assumes that the Company will elect under Internal Revenue Code Section 108(b)(5) to reduce its tax basis in depreciable assets in order to preserve a significant portion of its NOLs and that the Internal Revenue Code Section 382(l)(5) exception will apply to permit the Company to use such NOLs without limitation. Moelis' analysis incorporates the Company's projections of its tax depreciation and amortization, as well as the value of the Company's NOLs. The value of the NOLs was estimated as the present value of the tax savings that the Company expects to obtain from the usage of these NOLs. The value of these NOLs was added to the enterprise value estimates from the three selected valuation methodologies.

## C.    VALUATION CONSIDERATIONS

An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimates of total enterprise value set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors, Moelis, nor any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' and Reorganized Debtors' operations or changes in the financial markets, Moelis' valuation analysis as of the Effective Date may differ from that disclosed herein. In addition, any valuation of newly issued securities implied by the estimates of value set forth herein is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial

markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by these Chapter 11 Cases or by other factors not possible to predict. Accordingly, the Estimated Reorganized Debtors' Enterprise Value estimated by Moelis does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

## D.    FINANCIAL PROJECTIONS

As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of certain financial projections as attached hereto as **Exhibit C** (the "Projections"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each Holder of a Term Loan Claim in determining whether to accept or reject the Plan.

The Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors. In general, as illustrated by the Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The estimates and assumptions in the Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Projections. No representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Debtors considered or consider the Projections to reliably predict future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**The Debtors did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Debtors' independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**The Debtors do not, as a matter of course, publish projections of their anticipated financial position, results of operations or cash flows. Accordingly, neither the Debtors nor the Reorganized Debtors intend to, and each disclaims any obligation to: (a) furnish updated projections to Holders of Allowed Claims prior to the Effective Date or to Holders of New Term Loan A, New Term Loan B, the HoldCo Loan, New Common Stock, or to any other party after the Effective Date; (b) include any such updated information in any documents that may be required to be filed with the SEC; or (c) otherwise make such updated information publicly available.**

K&E 14435441.

**The Debtors periodically issue press releases reporting financial results and Holders of Claims and Equity Interests are urged to review any such press releases when, and as, issued.**

The Debtors prepared the Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors.

Although the forecasts represent the best estimates of the Debtors, for which the Debtors believe they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Debtors after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the forecast results will be achieved.

While, after the Effective Date, the Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation in March 2009, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also they have been presented in lieu of pro forma historical financial information. Reference should be made to Article IX, entitled "Plan Related Risk Factors And Alternatives To Confirming And Consummating The Plan" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.

**ARTICLE VII**
**CONFIRMATION PROCEDURES**

## A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. On or about the Petition Date, the Company will promptly seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement and confirmation of the Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available at Company's Voting Agent's website, http://www.kccllc.net/sourceinterlink. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Company believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case,

53

has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, and the Revolving Credit Facility Claims (to the extent any such claims have not been indefeasibly repaid in full in Cash from the proceeds of the DIP Facilities prior to the Effective Date) will be paid in full on the Effective Date.

- At least one Class of Impaired Claims and Equity Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Company believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11; and (3) the Plan has been proposed in good faith.

1.    **Best Interests of Creditors Test/Liquidation Analysis**

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Chapter 11 Cases were converted to liquidation cases under Chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a Chapter 7 trustee to liquidate all of the assets into Cash. The Company's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Company at the time of the conversion to Chapter 7 cases, and the proceeds resulting from the Chapter 7 trustee's sale of the Company's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the Chapter 7 liquidation and any additional Administrative Claims incurred during the Chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical Chapter 7 liquidation of the Company (after subtracting the Chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a Chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set

forth in the Plan. In a hypothetical Chapter 7 liquidation of the Company's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Further, in Chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order: (a) holders of secured claims (to the extent of the value of their collateral); (b) holder of priority claims; (c) holders of unsecured claims; (d) holders of claims expressly subordinated by its terms or bankruptcy court order; and (e) holders of equity interests.

Of the foregoing groups of Claims, the DIP Facility Claims, Other Priority Claims, Other Secured Claims, Revolving Credit Facility Claims, General Unsecured Claims, Administrative Claims, Intercompany Claims and Intercompany Interests are either unclassified or "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims and Interests are deemed to accept the Plan. Term Loan Claims are "Impaired" under the Plan and are entitled to vote on the Plan. The Section 510(b) Claims are to receive no distribution under the Plan and, therefore, are deemed to reject the Plan. Because the Bankruptcy Code requires that impaired creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical Chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a Chapter 7 liquidation, after accounting for recoveries by Secured, Administrative, and Priority creditors, the impaired creditors and interest holders will receive more or less than under the Plan. If the probable distribution to impaired creditors and interest holders under a hypothetical Chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of impaired creditors and interest holders.

As described in more detail in the liquidation analysis set forth in **Exhibit D** hereto (the "Liquidation Analysis"), the Company believes that the value of any distributions in a Chapter 7 case would be less than the value of distributions under the Plan. In particular, proceeds received in a Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a Chapter 7 trustee would likely further reduce Cash available for distribution.

**2.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates a Plan in which virtually all creditors (other than Holders of the Senior Notes) will be paid in full, and the Company's balance sheet will become materially deleveraged. In addition, the Plan also contemplates that the DIP Revolving Credit Facility will be paid in full in Cash with the proceeds of the Exit Facility, and, therefore, sufficient funds will exist to make all payments required by the Plan. Moreover, obligations arising under the HoldCo Loan should not affect the Plan's feasibility because these obligations will be structurally subordinated to obligations of Reorganized Source Interlink Companies and its subsidiaries. The Company's overall enterprise value will accrue directly to stakeholders of Reorganized Source Interlink Companies and its subsidiaries in the first instance, while the Company's residual value will accrue to HoldCo stakeholders through the HoldCo Loan and the New Common Stock. For these reasons, the Company believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11).

**3.    Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims and Equity Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of that claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the equity interest holder is entitled or any fixed price at which the debtor may redeem the security.

55

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims and Interests in Classes 1, 2,3, 6, 7 and 8 are not Impaired under the Plan, and as a result the Holders of such Claims and Interests are deemed to have accepted the Plan.

Term Loan Claims in Class 4 are Impaired under the Plan.  The voting class will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims and Equity Interests of such Classes (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 5, 9 and 10 will not receive a distribution under the Plan and are deemed to reject the Plan and are not entitled to vote on the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Equity Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank.  Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against.  Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that:  (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either:  (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either:  (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not

K&E 14435441.

receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The Company submits that if the Company "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## C.    RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each Holder of a Class 4 Claim should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article IX, entitled "Plan Related Risk Factors And Alternatives To Confirming And Consummating The Plan."

## D.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact: Counsel for the Debtors: Paul Wierbicki, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, via e-mail at pwierbicki@kirkland.com, or by phone at (312) 862-7066.

## E.    DISCLAIMER

In formulating the Plan, the Company has relied on financial data derived from books and records. The Company, therefore, represents that everything stated in this Disclosure Statement is true to the best of their knowledge. The Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Company for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Company have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Company, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by the Company shall have no liability for the information in this Disclosure Statement.**

K&E 14435441.

Solicitation Version

**The Company and their professionals also have made a diligent effort to identify in this Disclosure Statement pending litigation claims and projected objections to claims. However, no reliance should be placed on the fact that a particular litigation claim or projected objection to claim is, or is not, identified in this Disclosure Statement.**

**ARTICLE VIII**
**IMPLEMENTATION OF THE PLAN AND POSTPETITION**
**GOVERNANCE OF REORGANIZED DEBTORS**

**A.    BOARD OF DIRECTORS AND MANAGEMENT**

**1.    Reorganized Debtors' Board of Directors**

On the Effective Date, the New Board of the Reorganized Debtors shall take office. The Company will disclose the identities of the individuals comprising the New Board in an exhibit to the Plan Supplement. Each such director shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents. The existing board of directors of Source Interlink Companies will be deemed to have resigned on and as of the Effective Date.

**2.    The Reorganized Debtors' Officers**

The Company will disclose the identities of the individuals comprising the officers of the Reorganized Debtors in an exhibit to the Plan Supplement.

**B.    INDEMNIFICATION OF DIRECTORS AND OFFICERS**

The Reorganized Debtors' articles of incorporation or formation, as applicable, will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors or managers, and agents to the fullest extent permitted under the applicable state law.

**C.    MANAGEMENT INCENTIVE PROGRAM**

The Plan provides for a post-Effective Date Management Incentive Program providing for a certain percentage of New Common Stock, on a fully-diluted basis (which percentage shall be disclosed pursuant to the Plan Supplement), to be reserved for issuance as grants to designated senior management of HoldCo or Reorganized Source Interlink Companies, as the case may be, in the form of New Common Stock and/or options to purchase shares of New Common Stock, the terms of which plan shall be determined and implemented on or as soon as reasonably practicable after the Effective Date by the New Board or any compensation committee thereof in its discretion.

**D.    EXIT FINANCING ARRANGEMENTS**

On or prior to the Effective Date, the Company will enter into the Exit Facility Agreement, the HoldCo Loan Agreement, and the New Term Loan Credit Agreement.

**1.    Exit Facility Agreement**

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by HoldCo, if any, and the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facility Agreement and such other documents as may be required to effectuate the treatment afforded to such lenders pursuant to the Exit Facility Agreement. The Reorganized Debtors may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs. To the extent Revolving Credit Facility Claims are not rolled up by the DIP Revolving Credit Facility as of the Effective Date, Revolving Credit Facility Claims shall be paid in full in Cash with the proceeds of the Exit Facility.

K&E 14435441.

Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Facility Agreement, DIP Revolving Credit Facility and the Revolving Credit Facility shall be refinanced and the Revolving Credit Agreement and the DIP Revolving Credit Facility Agreement shall be deemed to have been terminated and extinguished. Notwithstanding the foregoing, all obligations of the Debtors to the DIP Revolving Credit Facility Agent and the DIP Revolving Credit Facility Lenders under the DIP Revolving Credit Facility Agreement which are expressly stated in the DIP Revolving Credit Facility Agreement as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect. For purposes of any Trade Intercreditor Agreement, the Exit Facility shall be deemed an amendment, modification or refinancing of the Revolving Credit Facility.

Upon the date the Exit Facility Agreement becomes effective, (1) HoldCo, the Debtors and the Reorganized Debtors are authorized to execute and deliver the Exit Facility Agreement and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (2) the Exit Facility Documents shall constitute the legal, valid and binding obligations of HoldCo (to the extent applicable) and the Reorganized Debtors which are parties thereto, enforceable in accordance with their respective terms, and (3) no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.

HoldCo, the Debtors and the Reorganized Debtors, as applicable, and any other Entities granting any Liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence of perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

## 2.    HoldCo Loan Agreement

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the HoldCo Loan Agreement, and upon the Effective Date and in accordance with the HoldCo Loan Agreement, the HoldCo Loan shall constitute legal, valid, and binding obligations of HoldCo, enforceable in accordance with its terms. Because the HoldCo Loan is structurally subordinated, the Reorganized Source Interlink Companies shall have no obligation to make any payments in respect of the HoldCo Loan, to make mandatory dividend payments to HoldCo, and any payments by HoldCo in respect of the HoldCo Loan will be made if and when dividends are received; all of the foregoing as described in the HoldCo Loan term sheet attached hereto as **Exhibit G**. The Debtors expect that the terms of the HoldCo Loan will be substantially consistent to the terms set forth in the term sheet attached hereto as **Exhibit G**.

## 3.    New Term Loan Credit Agreement

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the New Term Loan Credit Agreement, and upon the Effective Date and in accordance with the New Term Loan Credit Agreement, the New Term Loan A and the New Term Loan B shall constitute legal, valid, and binding obligations of HoldCo and the Reorganized Debtors, enforceable in accordance with its terms.

Upon the date the New Term Loan A and the New Term Loan B become effective, HoldCo, the Debtors and the Reorganized Debtors are (1) authorized to execute and deliver the New Term Loan Credit Agreement and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (2) the New Term Loan Credit Agreement shall constitute the legal, valid and binding obligations of the Reorganized Debtors which are parties thereto, enforceable in accordance with their respective terms, and (3) no obligation, payment, transfer or grant of security under the New Term Loan Credit Agreement shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim. For purposes of any Trade Intercreditor Agreement, the New Term Loan Credit Agreement shall be deemed an amendment, modification or refinancing of the Term Loan.

HoldCo, the Debtors and the Reorganized Debtors, as applicable, and any other Entities granting any Liens and security interests to secure the obligations under the New Term Loan Credit Agreement are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence of perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

## ARTICLE IX
## PLAN RELATED RISK FACTORS AND ALTERNATIVES
## TO CONFIRMING AND CONSUMMATING THE PLAN

**Prior to voting to accept or reject the Plan, all Impaired Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

A.      **GENERAL**

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in the Company's various SEC filings, all of which are incorporated herein.

B.      **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.      **Parties in Interest May Object to Company's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims and interests in such class. The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created ten Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the one voting Class, the Company may elect not to File the Chapter 11 Cases or to amend the Plan.

3.      **The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan**

The Company cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Company receives the requisite acceptances, the Company cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Interest Holder might challenge the adequacy of this Disclosure Statement or the Solicitation Procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail above in Article VII, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would

receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code. While the Company believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

The Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests.

The Company, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

> 4.    **The Company May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan and the final DIP financing order, the Company reserves the right to object to the amount or classification of any Claim or Interest deemed Allowed under the Plan other than the Allowed amount of the Term Loan Claims. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in this Disclosure Statement.

> 5.    **Risk of Non-Occurrence of the Effective Date**

Although the Company believes that the Effective Date will occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

> 6.    **Substantive Consolidation Risks**

The Plan is premised upon substantively consolidating certain of the Company as set forth in Article IV.B of the Plan for purposes associated with confirming and consummating the Plan, including but not limited to voting, Confirmation, distribution, and streamlining the Company's corporate structure to more properly reflect their operations. The Company can provide no assurance, however, that: (a) the Bankruptcy Court will enter an order granting the Company's motion for substantive consolidation contemplated by the Plan; or (b) the Bankruptcy Court will overrule any objection that a party in interest might have to such substantive consolidation.

> 7.    **Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan**

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Company is consolidated and whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

C.    **FINANCIAL INFORMATION; DISCLAIMER**

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

D.    **FACTORS AFFECTING THE COMPANY**

The Company is exposed to various factors and risks which include but are not limited to the following.

61

1.    **Business-Related Risks**

    a.    **The Company derives a significant percentage of its revenue and profits from advertising revenue.**

        The Company derives a significant percentage of its revenue and profits from advertising revenue. The Company's advertising revenues are subject to risks arising from possible shifting of advertising spending amongst media and declines in general economic and business activity. The Company has recently suffered significant declines in its advertising revenues. For each of the fiscal quarters ended October 31, 2008 and January 31, 2009, print advertising revenues were $56.3 million and $44.0 million respectively, which represented a decrease of 16.6% and 20.5%, respectively, with respect to the applicable prior-year quarterly periods. A significant portion of the overall decrease in advertising spending is attributable to declines in the level of business activity of certain of the Company's advertisers, particularly U.S. and non-U.S. automobile manufacturers. A lesser portion of this decrease is attributable to shifting of advertising spending among different media and an overall decline in print advertising revenue reflect a shift to online advertising by some of the Company's customers. Continued deterioration in the Company's advertising revenues could have a material adverse effect on its revenues, profit margins.

    b.    **Sales of the Company's products depend, in part, on factors affecting consumer spending that are out of the Company's control.**

        The sales of magazines, videos and music products depend to a significant extent on numerous factors affecting discretionary consumer spending, including general economic conditions, disposable consumer income, fuel prices, recession and fears of recession, war and fears of war, inclement weather, consumer debt, interest rates, sales tax rates and rate increases, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security. In addition, spending on these items is affected significantly by the timing, pricing and success of new releases, all of which are not within the Company's control. Adverse changes in factors affecting discretionary spending could reduce consumer demand for the products the sells, thus negatively impacting its business and operating results.

    c.    **The Company's reliance on a few key suppliers in its DVD and CD distribution business makes it vulnerable to not being able obtain the products required by its customers.**

        The major labels and studios produce most of the music and video product that the Company distributes. The Company's success depends upon its ability to obtain product in sufficient quantities on competitive terms and conditions from each of the major labels and studios as well as from thousands of smaller suppliers. If the Company's suppliers do not provide it with sufficient quantities of the products it sells, the Company's sales and profitability will suffer. If there is a disruption in supply from a principal manufacturer or publisher, the Company may be unable to obtain the merchandise it desires to sell. If the discounts the Company receives from its suppliers were discontinued or reduced, its sales could be adversely affected. Finally, some of the products the Company distributes are available from only a single supplier and if that supplier refused to provide the Company with the product, the Company's sales could decrease.

    d.    **Substantially all of the magazines distributed by the Company are purchased from four suppliers and the Company's revenues could be adversely affected if it is unable to receive magazine allotments from these suppliers.**

        Substantially all of the magazines distributed by the Company in the United States are supplied by or through one of four national distributors, Comag Marketing Group, LLC, Curtis Circulation Company, Kable Distribution Services, Inc. and Time Warner Retail Sales and Marketing, Inc. Each title is generally supplied by one of these national distributors to the Company and generally cannot be purchased from any alternative source.

        The Company's success is largely dependent on its ability to obtain product in sufficient quantities on competitive terms and conditions from each of the national distributors. In order to qualify to receive copy allotments, the Company is required to comply with certain operating conditions, which differ between the specialty retail market and the mainstream market. The Company's ability to economically satisfy these conditions may be affected by events beyond its control, including the cooperation and assistance of its customers. A failure to satisfy

K&E 14435441.

these conditions could result in a breach of the Company's purchase arrangements with its suppliers and entitle the Company's suppliers to reduce its copy allotment or discontinue its right to receive product for distribution to the Company's customers. If the Company's supply of magazines were reduced, interrupted or discontinued, customer service would be disrupted and existing customers may reduce or cease doing business with the Company altogether, thereby causing the Company's revenue and operating income to decline and result in failure to meet expectations.

In the recent past, certain national distributors cut the Company off from their supply of periodicals. The Company filed an action on February 2, 2009, which is currently pending before the United States District Court for the Southern District of New York, captioned under *Source Interlink Distribution, L.L.C. et. al v. American Media, Inc. et. al*, Case No. 09 Civ. 1152 (S.D.N.Y).

> **e.    The Company's revenue from the sales of DVDs and CDs has suffered due to a shift in consumer demand away from physical media and toward digital downloading and other delivery methods.**

The Company's total revenues from the sales of physical music CDs have declined from approximately 52.9% of its total revenue for the fiscal year ended January 31, 2005 to approximately 17.1% for the fiscal year ended January 31, 2009 due, in large part, to the fact that consumers are more frequently buying music digitally from many providers such as Apple Computer (through iTunes), Music Match, Rhapsody, Microsoft (through MSN) and others. The sale of digital music has grown significantly in the past few years, and the recording industry saw sales revenue for CDs decline significantly from calendar years 2001 to 2008. As digital distribution of music and video content continues to increase in popularity and gain more broadly based consumer acceptance, it will adversely impact the Company's sales and profitability. The recording industry also continues to face difficulties as a result of illegal online file-sharing and downloading. While industry associations and manufacturers have successfully launched legal action against illegitimate downloaders and file-sharers to curtail these practices, there can be no assurance of the effect of these lawsuits. File sharing and downloading, both legitimate and illegal, could continue to exert pressure on the demand for CDs. Additionally, as other forms of media become available for digital download, the Company's revenues and profitability attributable to CDs and DVDs may be adversely affected.

Recent advances in the technologies to deliver movies to viewers may adversely affect public demand for DVDs distributed by the Company. For example, some digital cable providers and internet companies offer movies "on demand" with interactive capabilities such as start, stop and rewind. Direct broadcast satellite and digital cable providers have been able to enhance their on-demand offerings as a result of their ability to transmit over numerous channels. Although not as broadly-based as the digital distribution of music, Apple Computer (through iTunes), NetFlix and others have begun to offer video content digitally. Apart from on-demand technology, the recent development and enhancement of personal video recorder technology with "time-shifting" technology (such as that used by TiVo and certain cable companies) has given viewers greater interactive control over broadcasted movies and other program types. Also, companies such as Blockbuster Entertainment and NetFlix are now offering subscription services which provide consumers the ability to rent DVDs for indefinite periods of time without being subject to late fees.

As these methods of consuming recorded music and filmed entertainment increase in popularity and gain more broadly based consumer acceptance, they will adversely impact the Company's revenues and profits.

> **f.    The Company has a concentrated customer base and its revenues could be adversely affected if it loses any of its largest customers or these customers are unable to pay amounts due to the Company.**

If any of the Company's largest customers were to stop or reduce their purchasing from the Company, the Company's financial results would be seriously damaged. In particular, Barnes & Noble, Inc., accounted for 24.1%, 21.6% and 19.6% of the Company's total revenues in the fiscal years ended January 31, 2009, 2008 and 2007 respectively. In the aggregate, for the first quarter of fiscal year 2009, the Company's top three customers accounted for approximately 50% of its total revenues.

Moreover, substantially all of the magazines published by the Company and distributed for single copy sale are sold to wholesalers (including the Company's subsidiary, Source Interlink Distribution, LLC) through a single national distributor. Under applicable agreements, the national distributor bears the risk of non-payment by the magazine wholesalers, except under limited circumstances. Many of the wholesalers claim to be in severe financial distress. If the Company's national distributor became unwilling or unable to continue bearing this credit risk, the Company's financial results could be seriously damaged.

The Company expects to continue to be dependent on a small number of customers for a substantial portion of its revenues. If any of these customers were to terminate their relationship with the Company, significantly reduce their purchases from the Company or experience problems in paying amounts due to the Company, it would result in a material reduction in the Company's revenues, operating profits and cash flows.

**g.      Inventory risk due to an inability to return product is a constant risk to the Company's business.**

The Company bears inventory risk associated with the financial viability of its suppliers. If a publisher, label or studio cannot provide refunds in cash for the inventory the Company desires to return, it may be forced to expense such inventory costs. Further, the Company often experiences higher return rates for products of financially troubled labels and studios. If the Company fails to manage its inventory to avoid accumulating substantial product that cannot be returned, it would result in a material reduction in the Company's revenues, operating profits and cash flows.

**h.      Competition**

The Company's media content and fulfillment operating segments face significant competition. The principal competitive factors affecting these divisions are price, the Company's financial stability, breadth of products and services offered and reputation. The SIM segment competes for advertising on the basis of circulation and the niche markets that are served by its publications. Each of the Company's enthusiast publications faces competition in its subject area from a variety of publishers and competes for readers by providing targeted editorial content, which is provided by in-house company and freelance writers. Specifically, in the high-end and new car markets, the Company's publications compete primarily against *Car and Driver* and *Road and Track*, both owned by Hachette Filipacchi Media U.S. Inc. The Company also competes in individual enthusiast markets with a number of smaller, privately-owned or regionally-based magazine publishers.

The fulfillment groups distribute home entertainment products in competition with a number of national and regional companies, including Hudson News Company, The News Group, Ingram Book Group, Inc., Ingram Entertainment, Inc., Handleman Company, and Baker & Taylor, Inc. In addition, major record labels and motion picture studios compete with the Company by establishing direct trading relationships with the larger retail chains.

The In-Store Services group has a very limited number of direct competitors for its claims submission program, and it competes in a highly fragmented industry with other manufacturers in the wire display fixture business. In addition, some of this group's information and management services may be performed directly by publishers and other vendors, retailers or distributors.

Some of the Company's existing and potential competitors have substantially greater resources and greater name recognition than the Company does with respect to the market or market segments they serve.

**i.      The Company depends on access to credit.**

The Company has significant working capital requirements principally to finance inventory, accounts receivable and new acquisitions. As well as the Exit Facility, the New Term Loan A, and the New Term Loan B contemplated under the Plan that the Company will be party to, the Company is extended significant amounts of trade credit by its suppliers. Certain credit facilities are, or may be, secured by substantially all of the assets of the Company and its subsidiaries.

The Company's ability to comply with covenants or maintain sufficient eligible assets under its credit facilities may be affected by events beyond its control, including prevailing economic, financial and industry

64

conditions. If the Company defaults, its lenders may no longer be obligated to extend loans to the Company and could declare all amounts outstanding under the credit facilities, together with accrued interest, to be immediately due and payable. If the Company is unable to repay those amounts, its lenders could proceed against the collateral interest granted to them to secure that indebtedness. The results of such actions would have a significant negative impact on the Company's results of operations and financial condition.

> **j.    The Exit Facility, the New Term Loan A, and the New Term Loan B contemplated under the Plan contain covenants that will limit operating flexibility, and the Company may incur additional future debt.**

The Exit Facility, the New Term Loan A, and the New Term Loan B contain covenants that, among other things, restrict the Company's ability to take specific actions, even if the Company believes them to be in its best interest. These covenants will, among other things, provide for:

- limitations on liens;

- limitations on debt (including debt incurred by direct or indirect subsidiaries and obligations in respect of foreign currency exchange and other hedging arrangements;

- limitations on dividends, redemptions and repurchases with respect to capital stock;

- limitations on prepayments, redemptions and repurchases of debt;

- limitations on loans and investments;

- limitations on mergers, consolidations, acquisitions, asset disposition and sale/leaseback transactions;

- limitation on transactions with affiliates;

- limitations on changes in business conducted by the Company;

- limitations on amendment of debt and organizational documents;

- limitations on restrictions on distributions from subsidiaries;

- limitations on the issuance and sale of capital stock of the Company's subsidiaries;

The Company may also be required to maintain certain financial covenants. These financial covenants may become more restrictive over time. There is no assurance that the Company will be able to satisfy such covenants in the future. A breach of any of such covenants could result in a default under the Exit Facility, the New Term Loan A, and the New Term Loan B. If any such default occurs, the lenders could elect to declare all amounts outstanding and accrued and unpaid interest to be immediately due and payable, and the lenders thereafter could foreclose upon the assets securing such facility. The lenders also have the right in these circumstances to terminate any commitments they have to provide further borrowings. An event of default under any one of the facilities could result in an event of default under the other debt instruments. In that event, there is no assurance that the Company would have sufficient assets to repay all of its obligations.

In addition, the Company may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those applicable to the Exit Facility, the New Term Loan A, and the New Term Loan B. The restrictions contained in the Exit Facility, the New Term Loan A, and the New Term Loan B limit the Company's ability to plan for or react to market conditions and meet capital needs, otherwise restrict the Company's activities or business plans and adversely affect the Company's ability to finance its operations, enter into acquisitions or to engage in other business activities that would be in the Company's interest. The Company's

ability to comply with any financial covenants will likely be affected by events beyond the Company's control, and there is no assurance that the Company will satisfy those requirements.

> **k.    The Company may not be able to achieve its projected financial results.**

The financial projections set forth on **Exhibit C** to this Disclosure Statement represent Company management's best estimate of the Company's future financial performance based on currently known facts and assumptions about the Company's future operations as well as the U.S. and world economy in general and the industry segments in which the Company operates in particular.  The Company's actual financial results may differ significantly from the projections.  If the Company does not achieve its projected financial results, the value of the New Common Stock may be negatively affected and the Company may lack sufficient liquidity to continue operating as planned after the Effective Date.

> **l.    The Company conducts a growing portion of its business internationally, which presents additional risks to the Company over and above those associated with its domestic operations.**

Approximately 6.1% of the Company's total revenues from magazine distribution for the fiscal year 2009 were derived from the export of U.S. publications, primarily to the United Kingdom and Australia.  Approximately 4.7% of the Company's gross U.S. distribution of magazines for that same period consisted of distribution of foreign publications in the U.S.  The Company imports over 1,500 magazine titles, which accounts for more than 90% of imported magazine sales nationwide.

The conduct of business internationally presents additional inherent risks including:

- Unexpected changes in regulatory requirements;

- Import and export restrictions;

- Tariffs and other trade barriers;

- Differing technology standards;

- Resistance from retailers to the Company's business practices;

- Employment laws and practices in foreign countries;

- Political instability;

- Fluctuations in currency exchange rates;

- Imposition of currency exchange controls;

- Potentially adverse tax consequences; and

- Competition from the primary participants in those markets that may have significantly greater market knowledge and that may have substantially greater resources than does the Company.

Any of these risks could adversely affect revenue and operating profits of the Company's international operations.

K&E 14435441.

m.    **The Company's intellectual property is an important component of its business. If it were unable to protect its intellectual property, its competitive position would be damaged.**

The Company believes that its trademarks and other proprietary rights, including its magazine and world wide web published content and images are material to its success and competitive advantage. Even though the Company tries to protect its intellectual property, its actions may not be adequate to prevent infringement by others. Other persons could, in the future, assert rights in, or ownership of, the Company's intellectual property rights. The Company may not be able to successfully resolve these potential conflicts. In addition, the laws of foreign countries may not always protect intellectual property to the same extent as do the laws of the United States.

n.    **The Company depends upon key personnel**

The Company's future success depends upon the knowledge, ability, and experience of its personnel. The loss of key personnel responsible for managing the Company or for advancing its business strategies could adversely affect the Company's business and financial condition.

o.    **The Company's business could be materially harmed or disrupted by natural disasters and public disturbances.**

The occurrence of natural disasters and public disturbances such as earthquakes, floods, wildfires, tornadoes, hurricanes, power outages, terrorism, war, civil unrest and similar events could materially harm and disrupt the Company's business. In addition, such events could adversely impact the market for the Company's goods and services in many of the geographic areas in which it operates. The losses from such events and the harm to the Company's business caused thereby could materially impair its financial position. Some or all of the amount of such losses (including losses attributable to the disruption of the Company's business) may not be covered by insurance.

2.    **Risks related to the New Common Stock**

a.    **Transfer of the New Common Stock will be restricted.**

The New Common Stock has not been registered under the Securities Act or any state or foreign securities laws. Until holders of New Common Stock are able to freely transfer the new common stock pursuant to Rule 144 under the Securities Act, such holders may not offer or sell the New Common Stock in the United States or to, or for the account or benefit of, a U.S. person, as defined in Regulation S, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. It is the obligation of the holder of New Common Stock to ensure that its offers and sales of New Common Stock comply with applicable securities laws. In addition, the New Common Stock may be subject to certain transfer restrictions in the Shareholders Agreement.

b.    **There is currently no trading market for the shares of New Common Stock, and an active liquid trading market for the New Common Stock may not develop.**

There is currently no existing trading market for the shares of New Common Stock. The Company does not currently intend to apply for listing of the shares of New Common Stock on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the shares of New Common Stock and, even if one develops, such public trading market may not be maintained. If an active public trading market for the shares of New Common Stock does not develop or is not maintained, the market price and liquidity of such securities is likely to be adversely affected and holders may not be able to sell such securities at desired times and prices or at all. If any shares of New Common Stock are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the shares of New Common Stock will depend on and may be adversely affected by unfavorable changes in many factors, including, without limitation:

- prevailing interest rates, increases in which may have an adverse effect on the share price of the New Common Stock;

- the Company's business, financial condition, results of operations, prospects and credit quality;

- the market for similar securities and the overall securities market; and

- general economic and financial market conditions.

Many of these factors are beyond the Company's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the shares of New Common Stock, regardless of the Company's business, financial condition, results of operations, prospects or credit quality.

The shares of New Common Stock have not been registered under the Securities Act, which could effect the liquidity and price of the New Common Stock. The shares of New Common Stock may be transferred by holders of such shares to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the Shareholders Agreement. This could substantially adversely impact both the liquidity and the share price of the New Common Stock.

### 3. Legal Proceedings

In the normal course of business, the Company is subject to various legal proceedings and claims. Accordingly, although the Company believes it has made adequate provisions for all current and threatened legal disputes, the Company may in the future become involved in legal disputes arising from its relationships with its employees, shareholders, business partners and creditors, or from other sources. Such legal disputes could result in large settlements and/or judgments which could materially impair the Company's financial condition. In addition, the defense of such proceedings could result in significant expense and the diversion of management's time and attention from the operation of the business, which could impede the Company's ability to achieve its business objectives. Some or all of the amount the Company may be required to pay to defend or to satisfy a judgment or settlement of any or all of these proceedings may not be covered by insurance.

### E.    CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to certain Holders of Claims and to the Debtors, see Article XI below, entitled "Certain Federal Income Tax Consequences."

### F.    RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

### G.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Company's Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Article VII above and **Exhibit D**.

**These risk factors contain certain statements that are "forward looking statements" within the meaning of Section 21E of the Securities Exchange Act and are made pursuant the safe harbor provisions thereof. These**

statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity, or other financing to fund operations, currency exchange rate fluctuations, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies, and other market and competitive conditions. Holders of Claims and Equity Interests are cautioned that the forward looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward looking statements and the Debtors undertake no obligation to update any such statements.

ARTICLE X
SECURITIES LAW MATTERS

A.      PLAN SECURITIES

        The Plan provides for the Company to issue to Holders of Term Loan Claims in Class 4 the New Common Stock (the "Plan Securities").

        The Company believes that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Company further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

B.      ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

        1.      Exemption from Registration

        Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

        Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

        In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

        To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

        If the Plan Securities are not covered by section 1145 of the Bankruptcy Code, the Plan Securities will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under

69

the Securities Act. Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law in the event that section 1145 is not applicable to the Plan Securities.

  2.  **Resales of Plan Securities; Definition of Underwriter**

    Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

    The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

    Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. Accordingly, the Company recommends that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

**C.  LISTING OF NEW COMMON STOCK**

    The Company shall not be obligated to list the New Common Stock on a national securities exchange.

**ARTICLE XI**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

    The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, HoldCo (together with the Reorganized Debtors, the

"Reorganized Company") and certain Holders of Claims and Equity Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Company has not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it discuss gift tax issues. This summary does not purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Company within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims or Equity Interests or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark to market method of accounting, and Holders of Claims who are themselves in bankruptcy). This discussion assumes that Holders of Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular Holder of a Claim. Each Holder of a Claim should seek advice from its independent tax advisors concerning the United States federal, state, local, foreign income and other tax consequences of the Plan in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which the Company is a party will be respected for U.S. federal income tax purposes in accordance with their form.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Equity Interest. All Holders of Claims and Equity Interests are urged to consult their tax advisors for the federal, state, local, and other tax consequences applicable under the Plan.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND THE REORGANIZED COMPANY**

The Company expects to report consolidated net operating loss carryforwards for U.S. federal income tax purposes of approximately $288 million as of January 31, 2009. As discussed below, the amount of the Company's consolidated current year net operating losses and net operating loss carryforwards (collectively, "NOLs") may be significantly reduced or eliminated upon implementation of the Plan. In addition, the Reorganized Company's subsequent utilization of any remaining NOLs and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

71

1.      **Reduction of NOLs**

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOLs, tax credits, and tax basis in assets, by the amount of any cancellation of indebtedness income ("COD") realized upon consummation of the debtor's plan of reorganization. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).

As a result of Consummation of the Plan, and in particular the cancellation of some Claims and the exchange of some of the Class 4 Term Loan Claims for New Common Stock, the Company expects to realize substantial COD.  The extent of such COD and resulting tax attribute reduction will depend  on the value of the New Common Stock, assuming that none of the Claims, HoldCo Debt (as defined below), or New Term B Debt are viewed as publicly traded for tax purposes. Subject to the next paragraph, based on the estimated reorganization value of the Reorganized Company, it is anticipated that the amount of COD will exceed the amount of the NOLs , which would eliminate the NOLs and reduce the Reorganized Company's tax basis in its assets.   Absent an election under section 108(b)(5) of the Tax Code, discussed below, the Reorganized Debtors' tax basis in their assets cannot be reduced below the total amount of its liabilities outstanding immediately after Consummation of the Plan.

2.      **Reduction of Tax Basis in Depreciable Assets**

Under section 108(b)(5) of the Tax Code, a taxpayer may elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to reduce NOLs and other tax attributes.  The Source Interlink Companies has not yet determined whether it will make the election under the Tax Code to apply any required tax attribute reduction first to depreciable property, with any excess not applied to reduce NOLs and other tax attributes.  If such election were made, the Reorganized Company's NOLs would survive post emergence, subject to the limitations described herein, but the basis of the Reorganized Source Interlink Properties' depreciable property could be reduced below the total amount of their liabilities outstanding immediately after Consummation of the Plan.

3.      **Limitation on NOLs and Other Tax Attributes**

Following the implementation of the Plan, the Company anticipates that any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and, possibly, certain other tax attributes of the Reorganized Company allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under Section 382 of the Tax Code as a result of an "ownership change" of the Reorganized Source Interlink Companies by reason of the transactions pursuant to the Plan.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.61% for ownership changes occurring in May). The annual limitation under section 382 represents the amount of  pre-change NOLs, as well as certain built-in losses recognized within the five-year period following the ownership change, that may be used each year to offset income. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  The annual limitation may be increased to the extent that the Reorganized Company recognizes certain built-in gains in its assets during the five-year period following the ownership change, including, pursuant to Notice 2003-65, any hypothetical increase in their depreciation or amortization as a result of any anticipated net unrealized built-in gain on the Effective Date. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

4.      **Pre-Confirmation Measures**

To ensure that no "ownership change" occurs prior to Confirmation of the Plan, on the Petition Date, the Company will file a motion requesting an order restricting trading in the equity securities of Source Interlink Companies by certain "substantial" shareholders who hold 4.5% or more of the value of such securities or who have

72

an intention to become a "substantial" shareholder. These restrictions will become irrelevant once the Plan is confirmed and the Equity Interests are cancelled.

### 5.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.61% for ownership changes occurring in May). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### 6.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when former stockholders and so called "qualified creditors" of a company in bankruptcy receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Source Interlink Companies undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Company's Section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of its Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Company would not be required to reduce its NOLs by the amount of interest deductions claimed by the Company within the prior three year period and the Reorganized Source Interlink Companies may undergo a change of ownership within two years without triggering any reduction in their Section 382 annual limitation.

The Company has not yet determined whether it will elect to utilize the 382(l)(5) Exception. In the event that the Company does not use the 382(l)(5) Exception, the Company expects that the Reorganized Debtors' use of Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.

### 7.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might able to offset all of its taxable income for regular tax purposes by available NOLs, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOLs (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets will be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

B.     **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLASSES 1, 2, 3, 6, AND 7 CLAIMS AND INTERESTS**

Pursuant to the Plan, Holders of Classes 1, 2, 3, 6, and 7 will either receive Cash in full payment of their Claims and Interests or have their Claims and Interests reinstated and rendered unimpaired. A Holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (2) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

C.     **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLASS 4 TERM LOAN CLAIMS**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, Holders of Class 4 Term Loan Claims will receive New Common Stock, obligations under the HoldCo Loan (the "HoldCo Debt") and obligations under the New Term Loan B (the "New Term Loan B Debt"). The U.S. federal income tax consequences of the Plan to such Holders of Claims will depend, in part, on whether the Claims surrendered, the HoldCo Debt, and/or the New Term Loan B Debt received constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Term Loan has a term of approximately seven years and the HoldCo Loan will have a term of four years and nine months, and the New Term Loan B will have a term of four years. The Company expects to take the position that the Term Loan Claims, the HoldCo Debt, and the New Term Loan B Debt are not "securities."

Under this position, assuming that Source Interlink Companies becomes HoldCo, a Holder should be treated as exchanging its Claims for New Common Stock, HoldCo Debt and New Term Loan B Debt in a fully taxable exchange. Alternatively, if HoldCo is a newly formed Entity, the Company intends to treat the Holders as engaging in two taxable exchanges: one in which they exchange a portion of their Claims with the Reorganized Source Interlink Companies in exchange for New Common Stock and New Term Loan B Debt, and another in which they exchange a portion of their Claims with HoldCo in exchange for HoldCo Debt. In either case, assuming that none of the Claims, the HoldCo Debt or the New Term Loan B Debt are viewed as "publicly traded" for tax purposes, the Holder should recognize gain or loss on the relevant exchange equal to the difference between (1) the Holder's tax basis in the Claims surrendered by the Holder in such exchange and (2) the fair market value of any New Common Stock on the Effective Date plus the stated principal amounts of any HoldCo Debt and any New Term Loan B Debt received in such exchange that is not allocable to accrued interest. If any of the Holder's Claims, the HoldCo Debt or the New Term Loan B Debt are viewed as "publicly traded" for tax purposes, the amount described in (2) above should be the fair market value of such New Common Stock plus the fair market value of such HoldCo Debt and New Term Loan B Debt on the Effective Date (rather than either debt's stated principal amount). Such gain or loss should be capital in nature (subject to the "market discount" rules described below) received in such exchange and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. A Holder's tax basis in the New Common Stock should equal its fair market value as of the Effective Date and, assuming that none of the Claims, the HoldCo Debt or the New Term Loan B Debt are viewed as "publicly traded" for tax purposes, a Holder's tax basis in the HoldCo Debt and the New Term Loan B Debt should equal their stated principal amounts. If any of the Holder's Claims, the HoldCo Debt, or the New Term Loan B Debt are viewed as "publicly traded" for tax purposes, a Holder's tax basis in the HoldCo Debt and the New

K&E 14435441.

Term Loan B Debt should equal their fair market value as of the Effective Date. A Holder's holding period for the New Common Stock, HoldCo Debt and New Term Loan B Debt should begin on the day following the Effective Date.

Pursuant to the Plan, the Debtors, the Reorganized Company, and the Holders shall treat the exchange of a Holder's Class 4 Claims for New Common Stock, HoldCo Debt, and New Term Loan B Debt for all tax purposes in the manner set forth in the Plan Supplement. The IRS could take the position, however, that the Holders should be treated for U.S. federal income tax purposes in some manner other than that set forth in the Plan Supplement, in which case a Holder may not be able to recognize any gain or loss on the exchange. Holders of Class 4 Term Loan Claims should consult their tax advisors regarding the tax consequences of exchanging their Claims pursuant to the Plan.

Holders of Class 4 Term Loan Claims should also consult their tax advisors regarding whether such Claims, the HoldCo Debt and the New Term Loan B Debt could be treated as "securities" for U.S. federal income tax purposes. If a Holder's Claims are so treated, the exchange of such Claims for New Common Stock, HoldCo Debt and New Term Loan B Debt could be treated as a tax-free recapitalization under the Tax Code, in which case a Holder could recognize gain, but not loss, on the exchange and would generally take a "carryover" basis in the New Common Stock and any debt treated as a security and a "cost" basis in any debt not treated as a security.

## D.    ACCRUED INTEREST

A portion of the consideration received by Holders of Claims may be attributable to interest that has accumulated since the principal investment or since the previous interest payment that has not been paid or taxed ("Accrued but Untaxed Interest"). Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Company. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to Accrued but Untaxed Interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan, in which case the Holder could recognize interest income. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

## E.    MARKET DISCOUNT

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for New Common Stock and New Term Loan B Debt on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder had elected to include market discount in income as it accrued). To the extent that the surrendered Claims acquired with market discount are deemed to be exchanged for New Common Stock and New Term Loan B Debt in a tax free recapitalization, any market discount that accrued on

75

such debt but was not recognized by the Holder may cause any gain recognized on the subsequent sale, exchange, redemption or other taxable disposition of the New Common Stock or New Term Loan B Debt to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

## F.    INFORMATION REPORTING AND BACK-UP WITHHOLDING

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

The Reorganized Company will withhold all amounts required by law to be withheld from payments of interest. The Reorganized Company will comply with all applicable reporting requirements of the Internal Revenue Service.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

K&E 14435441.

Solicitation Version

## ARTICLE XII
## CONCLUSION AND RECOMMENDATION

The Company believes the Plan is in the best interests of all creditors and urges the Holders of Term Loan Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by KCC no later than 5:00 p.m. (prevailing Eastern Time) on **April 27, 2009.**

Wilmington, Delaware
Dated:  April 25, 2009

Source Interlink Companies, Inc. (for itself and all other Debtors)

By: */s/ Douglas J. Bates*

Name: Douglas J. Bates
Title: Chief Legal Officer, Senior Vice President and Secretary of Source Interlink Companies, Inc.

Prepared By:

KIRKLAND & ELLIS LLP
David L. Eaton (*pro hac vice* pending)
David A. Agay (*pro hac vice* pending)
Paul Wierbicki (*pro hac vice* pending)
Ryan Preston Dahl (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654-3406

Proposed Co-Counsel for the Debtors
and Debtors-in-Possession

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705

Proposed Co-Counsel for the Debtors
and Debtors-in-Possession

**EXHIBIT A**

**DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION**

Solicitation Version

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    Chapter 11 |
| | )    Case No. 09-(     ) |
| Source Interlink Companies, Inc., et al.,[1] | )    Joint Administration Requested |
| | ) |
| Debtors. | ) |
| | ) |

---

### DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

David L. Eaton (*pro hac vice* pending)
David A. Agay (*pro hac vice* pending)
Paul Wierbicki (*pro hac vice* pending)
Ryan Preston Dahl (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Co-Counsel to the Debtors

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Proposed Co-Counsel to the Debtors

Dated: April 25, 2009

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Source Interlink Companies, Inc. (8299); AEC Direct, LLC (1003); Automotive.com, LLC (2610); Canoe & Kayak, Inc. (5510); Directtou, Inc. (4741); Enthusiast Media Subscription Company, Inc. (1137); Motor Trend Auto Shows, LLC (5888); RDS Logistics, LLC (0305); Source-Chestnut Display Systems, Inc. (6446); Source Home Entertainment, Inc. (8517); Source Interlink Distribution, LLC (3387); Source Interlink International, Inc. (1428); Source Interlink Magazines, LLC (3601); Source Interlink Manufacturing, LLC (7123); Source Interlink Media, LLC (4935); Source Interlink Retail Services, LLC (6967); Source Mid Atlantic News, LLC (7108); The Interlink Companies, Inc. (2991). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

i

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**...........................................................................................................1
- A.     Defined Terms .................................................................................................................1
- B.     Rules of Interpretation .................................................................................................11
- C.     Computation of Time....................................................................................................11
- D.     Governing Law..............................................................................................................12
- E.     Reference to Monetary Figures....................................................................................12
- F.     Reference to the Debtors or the Reorganized Debtors.................................................12

**ARTICLE II. DIP FACILITY CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS**...................................................................................................................................12
- A.     DIP Facility Claims.......................................................................................................12
- B.     Administrative Claims...................................................................................................12
- C.     Priority Tax Claims .......................................................................................................13

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**...............13
- A.     Summary of Classification ............................................................................................13
- B.     Treatment of Claims and Interests................................................................................14
- C.     Special Provision Governing Unimpaired Claims........................................................17
- D.     Acceptance or Rejection of the Plan.............................................................................17
- E.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .........17
- F.     Controversy Concerning Impairment............................................................................18

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................................18
- A.     Sources of Consideration for Plan Distributions..........................................................18
- B.     Substantive Consolidation.............................................................................................18
- C.     HoldCo..........................................................................................................................18
- D.     Exit Facility...................................................................................................................19
- E.     HoldCo Loan .................................................................................................................19
- F.     New Term Loan Credit Agreement...............................................................................20
- G.     Issuance of Reorganized Source Interlink Companies Equity Interests .......................20
- H.     Issuance of New Common Stock...................................................................................20
- I.      Section 1145 Exemption................................................................................................20
- J.      Listing of New Common Stock......................................................................................21
- K.     Corporate Existence.......................................................................................................21
- L.     Vesting of Assets in the Reorganized Debtors .............................................................21
- M.     Cancellation of Securities and Agreements..................................................................21
- N.     Restructuring Transactions............................................................................................22
- O.     Corporate Action...........................................................................................................22
- P.     Effectuating Documents; Further Transactions.............................................................22
- Q.     Exemption from Certain Taxes and Fees......................................................................23
- R.     Employee and Retiree Benefits.....................................................................................23
- S.     D&O Liability Insurance Policies .................................................................................23
- T.     Indemnification Provisions............................................................................................23
- U.     Preservation of Rights of Action...................................................................................24
- V.     Priority Tax Claims Bar Date .......................................................................................24

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....................24
- A.     Assumption and Rejection of Executory Contracts and Unexpired Leases...............................24
- B.     Payments Related to Assumption of Executory Contracts and Unexpired Leases .................25
- C.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ..........................................................................................................25
- D.     Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date ............................................................................................................................25

Solicitation Version

E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements...............25
F.    Indemnification Provisions...........................................................................................25
G.    Reservation of Rights....................................................................................................26
H.    Nonoccurrence of Effective Date..................................................................................26
I.    Rejection Claims Bar Date.............................................................................................26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .........................................................26
A.    Timing and Calculation of Amounts to Be Distributed ...............................................26
B.    Disbursing Agent...........................................................................................................26
C.    Rights and Powers of Disbursing Agent........................................................................27
D.    Distributions on Account of Claims Allowed After the Effective Date.........................27
E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .................27
F.    Compliance with Tax Requirements/Allocations .........................................................28
G.    Setoffs............................................................................................................................28
H.    Claims Paid or Payable by Third Parties.......................................................................29

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
        DISPUTED CLAIMS.......................................................................................................29
A.    Prosecution of Objections to Claims.............................................................................29
B.    Procedures Regarding Disputed Claims .......................................................................29
C.    Allowance of Claims and Interests ...............................................................................30
D.    No Distributions Pending Allowance............................................................................30
E.    Distributions After Allowance ......................................................................................30

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS.................30
A.    Discharge of Claims and Termination of Interests ......................................................30
B.    Subordinated Claims.....................................................................................................31
C.    Compromise and Settlement of Claims, Interests, and Controversies .......................31
D.    Debtor Release...............................................................................................................31
E.    Third Party Release .......................................................................................................32
F.    Exculpation ....................................................................................................................33
G.    Indemnification .............................................................................................................33
H.    Injunction.......................................................................................................................34
I.    Setoffs.............................................................................................................................34
J.    Release of Liens .............................................................................................................35

ARTICLE IX. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS .................35
A.    Professional Fee Escrow Account .................................................................................35
B.    Professional Fee Reserve Amount ................................................................................35
C.    Post-Confirmation Date Fees and Expenses ................................................................35

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
        THE PLAN .....................................................................................................................36
A.    Conditions Precedent to Confirmation.........................................................................36
B.    Conditions Precedent to Consummation......................................................................36
C.    Waiver of Conditions.....................................................................................................36
D.    Effective Date ................................................................................................................36
E.    Effect of Non-Occurrence of Conditions to Consummation........................................36

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .............................37
A.    Modification and Amendments......................................................................................37
B.    Effect of Confirmation on Modifications .....................................................................37
C.    Revocation or Withdrawal of the Plan ..........................................................................37

ARTICLE XII. RETENTION OF JURISDICTION...............................................................................37

Solicitation Version

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ........................................................................................... 39
    A.       Immediate Binding Effect ........................................................................................... 39
    B.       Additional Documents ................................................................................................ 39
    C.       Payment of Statutory Fees ......................................................................................... 39
    D.       Dissolution of Committees ......................................................................................... 39
    E.       Reservation of Rights ................................................................................................ 39
    F.       Successors and Assigns .............................................................................................. 40
    G.       Service of Documents ................................................................................................ 40
    H.       Term of Injunctions or Stays .................................................................................... 40
    I.        Entire Agreement ...................................................................................................... 40
    J.       Nonseverability of Plan Provisions .......................................................................... 40

## INTRODUCTION

Source Interlink Companies, Inc. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following prepackaged joint plan of reorganization for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF ALL OF THE ESTATES FOR ALL PURPOSES ASSOCIATED WITH CONFIRMATION AND CONSUMMATION OF THE PLAN.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

*A.     Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall no longer constitute Accrued Professional Compensation.

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

4.      "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed (or for which Claim under the Plan, the Bankruptcy Code, or Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; provided, however, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent,

unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

5.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

6.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases.

7.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the order of the United States District Court for the District of Delaware, the United States District Court for the District of Delaware.

8.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

9.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

10.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

11.     "*Causes of Action*" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

12.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

13.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

14.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

15.     "*Claims Objection Bar Date*" means, as applicable, the latest of: (x) 180 days after the Effective Date; (y) 180 days after the relevant Proof of Claim is Filed; or (z) such later period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors.

16.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

2

Solicitation Version

17.    *"Committee"* or *"Committees"* means any official committee (and any and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

18.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article X.A hereof having been:  (a) satisfied; or (b) waived pursuant to Article X.C hereof.

19.    *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

20.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

21.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

22.    *"Consummation"* means the occurrence of the Effective Date.

23.    *"Cure Claim"* means a Claim based upon the Debtors' defaults, if any, on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

24.    *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Petition Date.

25.    *"Debtor"* means one of the Debtors, in its individual capacity as a debtor in the Chapter 11 Cases.

26.    *"Debtor Release"* means the release given by the Debtors to the Debtor Releasees as set forth in Article VIII.D hereof.

27.    *"Debtor Releasee"* means, collectively, (a) all current and former officers, directors, managers, and employees of the Debtors; and (b) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals and affiliates of the Debtors, their subsidiaries, and each of their respective predecessors and successors in interest, and all of their respective current and former members (including *ex officio* members), officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals and affiliates, each in their respective capacities as such; provided, however, that no Non-Released Party will be a Debtor Releasee.

28.    *"Debtors"* means, collectively:    Source Interlink Companies, Inc.; AEC Direct, LLC; Automotive.com, LLC; Canoe & Kayak, Inc.; Directtou, Inc.; Enthusiast Media Subscription Company, Inc.; Motor Trend Auto Shows, LLC; RDS Logistics, LLC; Source-Chestnut Display Systems, Inc.; Source Home Entertainment, Inc.; Source Interlink Distribution, LLC; Source Interlink International, Inc.; Source Interlink Magazines, LLC; Source Interlink Manufacturing, LLC; Source Interlink Media, LLC; Source Interlink Retail Services, LLC; Source Mid Atlantic News, LLC; and The Interlink Companies, Inc.

29.    *"Debtors in Possession"* means, collectively, the Debtors, as debtors in possession in the Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

30.    *"DIP Agents"* means, collectively, the DIP Revolving Credit Facility Agent and the DIP Term Loan Agent.

31.    *"DIP Credit Agreements"* means, collectively, the DIP Revolving Credit Facility Agreement and the DIP Term Loan Agreement.

32.    *"DIP Facilities"* means, collectively, the DIP Revolving Credit Facility and the DIP Term Loan.

3

Solicitation Version

33.     "*DIP Facility Claims*" means, collectively, DIP Revolving Credit Facility Claims and DIP Term Loan Claims.

34.     "*DIP Lenders*" means, collectively, the DIP Revolving Credit Facility Lenders and the DIP Term Loan Lenders.

35.     "*DIP Revolving Credit Facility*" means that certain debtor in possession revolving credit facility entered into pursuant to the DIP Revolving Credit Facility Agreement.

36.     "*DIP Revolving Credit Facility Agent*" means the administrative agent under the DIP Revolving Credit Facility Agreement, or any successor agent appointed in accordance with such agreement.

37.     "*DIP Revolving Credit Facility Agreement*" means that certain debtor in possession credit agreement to be executed on or prior to the Petition Date by and among the Debtors, the DIP Revolving Credit Facility Agent, the DIP Revolving Credit Facility Lenders named therein, and the other parties thereto, as the same may be subsequently modified, amended, or supplemented, together with all instruments and agreements related thereto on commercially reasonable terms for similar transactions and substantially consistent with the term sheet attached to the Disclosure Statement as Exhibit E.

38.     "*DIP Revolving Credit Facility Claim*" means any and all Claims arising under or related to the DIP Revolving Credit Facility, including, without limitation, the "Related Document Obligations" as defined in the DIP Revolving Credit Facility Agreement.

39.     "*DIP Revolving Credit Facility Lenders*" means the DIP Revolving Credit Facility Agent and the banks, financial institutions, and other lender parties to the DIP Revolving Credit Facility Agreement from time to time, each in their capacity as such.

40.     "*DIP Term Loan*" means that certain debtor in possession term loan entered into pursuant to the DIP Term Loan Agreement.

41.     "*DIP Term Loan Agent*" means the administrative agent under the DIP Term Loan Agreement, or any successor agent appointed in accordance with such agreement.

42.     "*DIP Term Loan Agreement*" means that certain debtor in possession credit agreement to be executed on or prior to the Petition Date by and among the Debtors, the DIP Term Loan Agent, the DIP Term Loan Lenders named therein, and the other parties thereto, as the same may be subsequently modified, amended, or supplemented, together with all instruments and agreements related thereto on commercially reasonable terms for similar transactions and substantially consistent with the term sheet attached to the Disclosure Statement as Exhibit E.

43.     "*DIP Term Loan Claim*" means any and all Claims arising under or related to the DIP Term Loan.

44.     "*DIP Term Loan Lenders*" means the DIP Term Loan Agent and the banks, financial institutions, and other lender parties to the DIP Term Loan Agreement from time to time, each in their capacity as such.

45.     "*Disbursing Agent*" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan.

46.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated April 25, 2009, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

4

Solicitation Version

47.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

48.    "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which the conditions as specified in the Plan, including Article X.B hereof, have been satisfied or waived.  Unless otherwise specifically provided in the Plan, any of the documents contained in the Plan Supplement, or the DIP Credit Agreement, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

49.    "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

50.    "*Equity Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising therefrom; provided, however, that Equity Interest does not include any Intercompany Interest.

51.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

52.    "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Debtor Releasees; (d) the Indenture Trustee; (e) the Third Party Releasees; and (f) all of the current and former members (including *ex officio* members), officers, directors, managers, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided, however, that no Non-Released Party will be an Exculpated Party.

53.    "*Exculpation*" means the exculpation provision set forth in Article VIII.F hereof.

54.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

55.    "*Exit Facility*" means the new revolving credit facility to be entered into by the Debtors pursuant to the Exit Facility Agreement.

56.    "*Exit Facility Agent*" means the administrative agent to be appointed under the Exit Facility Agreement.

57.    "*Exit Facility Agreement*" means that agreement to be executed on or before the Effective Date, including any agreements, amendments, supplements or documents related thereto, on commercially reasonable terms for similar transactions acceptable to:  (a) the Debtors; and (b) the Required Plan Modification Agents and substantially consistent with the term sheet attached to the Disclosure Statement as Exhibit F.

58.    "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility and the Exit Facility Agreement.

59.    "*Fee Claim*" means a Claim for Accrued Professional Compensation.

60.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

61.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or

5

Solicitation Version

may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

62.    *"General Unsecured Claim"* means any unsecured Claim against any of the Debtors that is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Senior Notes Claim; (e) a Section 510(b) Claim; or (f) an Intercompany Claim.

63.    *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

64.    *"Holder"* means any Entity holding a Claim or an Interest.

65.    *"HoldCo"* means the holding company that shall hold 100% of the Reorganized Source Interlink Companies Equity Interests upon the Effective Date.

66.    *"HoldCo Loan"* means that $200 million unsecured term loan to be entered into pursuant to the HoldCo Loan Agreement.

67.    *"HoldCo Loan Agreement"* means that certain loan agreement to be executed on or prior to the Effective Date by the Debtors and the administrative agent as party thereto and the lenders as parties thereto on commercially reasonable terms for similar transactions acceptable to: (a) the Debtors; and (b) the Required Plan Modification Agents and substantially consistent with the term sheet attached to the Disclosure Statement as Exhibit G.

68.    *"Impaired"* means any Claim or Interest in an Impaired Class.

69.    *"Impaired Class"* means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

70.    *"Indemnification"* means the indemnification provision set forth in Article VIII.G hereof.

71.    *"Indemnification Provision"* means each of the Debtors' indemnification provisions currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

72.    *"Indemnified Parties"* means, collectively, the Debtors and each of their respective current and former officers, directors, managers, and employees, each in their respective capacities as such.

73.    *"Indenture"* means that certain indenture dated June 23, 2008 by and between Source Interlink Companies, Inc. and various Affiliates of Source Interlink Companies as guarantors, and HSBC Bank USA, National Association, as trustee.

74.    *"Indenture Trustee"* means HSBC Bank USA, National Association, in its capacity as trustee under the Indenture.

75.    *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

76.    *"Intercompany Contracts"* means any Executory Contract, Unexpired Lease, agreement, contract, or lease the parties to which are Debtors.

6