# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SOURCE INTERLINK COMPANIES, INC., <u>et al.</u>,[1] | ) Case No. 09-11424 (KG) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## DEBTORS' MEMORANDUM OF LAW (I) IN SUPPORT OF ENTRY OF AN ORDER (A) APPROVING (1) THE DEBTORS' DISCLOSURE STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (2) SOLICITATION OF VOTES AND VOTING PROCEDURES AND (3) FORMS OF BALLOTS AND (B) CONFIRMING THE DEBTORS' PREPACKAGED JOINT PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (WITH TECHNICAL AMENDMENTS) <u>AND (II) IN RESPONSE TO OBJECTIONS THERETO</u>

David L. Eaton (admitted *pro hac vice*)
David A. Agay (admitted *pro hac vice*)
Paul Wierbicki (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Co-Counsel to the Debtors

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel to the Debtors

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Source Interlink Companies, Inc. (8299); AEC Direct, LLC (1003); Automotive.com, LLC (2610); Canoe & Kayak, Inc. (5510); Directtou, Inc. (4741); Enthusiast Media Subscription Company, Inc. (1137); Motor Trend Auto Shows, LLC (5888); RDS Logistics, LLC (0305); Source-Chestnut Display Systems, Inc. (6446); Source Home Entertainment, Inc. (8517); Source Interlink Distribution, LLC (3387); Source Interlink International, Inc. (1428); Source Interlink Magazines, LLC (3601); Source Interlink Manufacturing, LLC (7123); Source Interlink Media, LLC (4935); Source Interlink Retail Services, LLC (6967); Source Mid Atlantic News, LLC (7108); The Interlink Companies, Inc. (2991). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

<u>**TABLE OF CONTENTS**</u>

**Page**

<u>TABLE OF AUTHORITIES</u> ................................................................................................ iv

<u>PRELIMINARY STATEMENT</u> ......................................................................................... 1

<u>BACKGROUND</u> ................................................................................................................ 3

<u>ARGUMENT</u> ..................................................................................................................... 8

I.      THE COURT SHOULD APPROVE THE DISCLOSURE STATEMENT,
        SOLICITATION PACKAGE AND SOLICITATION PROCESS. .................................. 9

      A.     The Debtors' Prepetition Solicitation Complies with the Requirements of
            Bankruptcy Code § § 1125 and 1126(b). ................................................................. 9

           1.     The Debtors' Prepetition Solicitation Was Exempt From the
                  Registration and Disclosure Requirements Otherwise Imposed by
                  Non-bankruptcy Law. ............................................................................ 10

           2.     The Disclosure Statement Provides Adequate Information Within
                  the Meaning of Bankruptcy Code § 1125(a). .............................................. 11

      B.     The Debtors' Solicitation Package and Solicitation Procedures are in
            Compliance with Bankruptcy Rules 3017 and 3018. .............................................. 13

           1.     The Debtors Have Complied With the Requirements of
                  Bankruptcy Rule 3017(d) and 3018(c). ...................................................... 13

           2.     The Debtors' Solicitation Satisfied the Requirements of
                  Bankruptcy Rule 3018. ......................................................................... 15

            3.     The Debtors' Solicitation Procedures Should be Approved Under
                  Bankruptcy Rule 3017(e). ...................................................................... 17

            4.     Approval of Procedures for Vote Tabulation. ............................................. 17

II.     THE COURT SHOULD CONFIRM THE PLAN. ........................................................ 19

      A.     The Plan Complies With Bankruptcy Code § 1129(a)(1). ..................................... 19

           1.     The Plan Satisfies the Classification Requirements of Bankruptcy
                  Code § 1122. ....................................................................................... 20

            2.     The Plan Satisfies the Seven Mandatory Plan Requirements of
                  Bankruptcy Code § § 1123(a)(1) - (a)(7). .................................................. 22

K&E 14581339.5

3.     Substantive Consolidation Is Justified by the Facts and Circumstances Herein. ..............................................................25

4.     Discretionary Contents Of The Plan. ........................................28

B.     The Debtors Have Complied Fully With the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)). ................................................35

C.     The Plan Has Been Proposed in Good Faith and not by any Means Forbidden by Law (Section 1129(a)(3)). ..................................................36

D.     The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)). ......................................37

E.     The Debtors Have Disclosed the Post-Emergence Directors and Officers and Their Appointment is Consistent With Public Policy (Section 1129(a)(5)). ........................................................................................38

F.     The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)). ...................................................................................40

G.     The Plan Is In The Best Interests Of Creditors And Interest Holders (Section 1129(a)(7)). ...................................................................................40

H.     Acceptance of Impaired Classes (Section 1129(a)(8)). ..........................42

I.     The Plan Complies With Statutorily Mandated Treatment Of Administrative And Priority Tax Claims (Section 1129(a)(9)). ...........................43

J.     At Least One Impaired Class of Claims has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)). ...............................44

K.     The Plan Is Feasible (Section 1129(a)(11)). .........................................44

L.     The Plan Provides For The Payment Of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ...............................................................................48

M.     The Plan Complies With Bankruptcy Code § 1129(a)(13) ...................48

N.     The Plan Satisfies the "Cram Down" Requirements. ............................48

1.     The Plan is Fair and Equitable With Respect to the Rejecting Classes. ......................................................................................49

2.     The Plan Does not Unfairly Discriminate With Respect to the Rejecting Classes. .................................................................50

O.      The Technical Amendments Do Not Materially and Adversely Affect Any Holders of Claims. ..................................................................................................52

III.    RESPONSES TO OBJECTIONS. ....................................................................................52

CONCLUSION ...............................................................................................................57

K&E 14581339.5

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.),
    701 F.2d 1071 (2d Cir. 1983) ............................................................................................. 36

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship,
    526 U.S. 434 (1999) ............................................................................................................ 41

Boston Post Rd. L.P. v. FDIC (In re Boston Post Road, L.P.),
    21 F.3d 477 (2d Cir. 1994) ................................................................................................. 20

Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman),
    585 F.2d 1171 (2d Cir. 1978) ............................................................................................. 45

Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),
    767 F.2d 417 (8th Cir. 1985) .............................................................................................. 45

CoreStates Bank, N.A. v. United Chem. Tech., Inc.,
    202 B.R. 33 (E.D. Pa. 1996) .............................................................................................. 45

FDIC v. Colonial Realty Co.,
    966 F.2d 57 (2d Cir. 1992) ................................................................................................. 26

Frito-Lay, Inc., v. LTV Steel Co., Inc. (In re Chateaugay Corp.),
    10 F.3d 944 (2d Cir. 1993) ................................................................................................. 20

Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),
    402 F.3d 416 (3d Cir 2005) ................................................................................................ 25

In re 203 North LaSalle St. Ltd. P'ship,
    190 B.R. 567 (Bankr. N.D. Ill. 1995),
    rev'd on other grounds by, 523 U.S. 1106 (1998) ..................................................... 46, 50

In re Ambanc La Mesa Ltd. P'ship,
    115 F.3d 650 (9th Cir. 1997) .............................................................................................. 51

In re Apex Oil Co.,
    118 B.R. 683 (Bankr. E.D. Mo. 1990) ............................................................................... 39

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006) ......................................................................................... 19, 29

In re Augie/Restivo Baking Co., Ltd.,
    860 F.2d 515 (2d Cir. 1988) ............................................................................................... 26

K&E 14581339.5

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ....................................................... 51

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) ........................................................ 39

*In re Bowles,*
  48 B.R. 502 (Bankr. E.D. Va. 1985) ........................................................... 51

*In re Briscoe Enters., Ltd.*,
  994 F.2d 1160 (5th Cir. 1993) .................................................................. 45

*In re Century Glove*,
  1993 WL 239489 (D. Del. Feb. 10, 1993) .............................................. 36, 41

*In re Chateaugay Corp.*,
  89 F.3d 942 (2d Cir. 1996) ........................................................................ 20

*In re Commercial W. Fin. Corp.*,
  761 F.2d 1329 (9th Cir. 1985) .................................................................. 21

*In re Conseco, Inc.*,
  301 B.R. 525 (Bankr. N.D. Ill. 2003) ....................................................... 32

*In re Coram Healthcare Corp.*,
  271 B.R. 228 (Bankr. D. Del. 2001) .......................................................... 36

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .......................................................... 30

*In re Dilts*,
  126 B.R. 470 (Bankr. W.D. Pa. 1991) ....................................................... 21

*In re Drexel Burnham Lambert Group, Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................... 39, 41

*In re DRW Prop. Co. 82*,
  60 B.R. 505 (Bankr. N.D. Tex. 1986) ........................................................ 20

*In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005) ...................................... 34

*In re Exaeris, Inc.*,
  380 B.R. 741 (Bankr. D. Del. 2008) .......................................................... 30

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ............................................................ 49

K&E 14581339.5

*In re Foamex Int'l Inc.*,
No. 05-12685 (Bankr. D. Del. Feb. 1, 2007) .................................................................. 33

*In re Focal Comm'cns Corp.*,
Case No. 02-13709 (MFW) (Bankr. D. Del. Apr. 30, 2003) ........................................... 21

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ....................................................................... 51

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .............................................................................. 19

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ......................................................................... 20

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987) ......................................................................................... 20

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................................................ 51

*In re Kaiser Aluminum Corp.*, No. 02-10429 (JFK),
2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ........................................................... 20

*In re Leslie Fay Co*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) .......................................................................... 26

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005) ..................................................................................... 11, 37

*In re Magnatrax Corp.*,
2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003) .................................................... 20

*In re Mayer Pollack Steel Corp.*, 174 B.R. 414 (Bankr. E.D. Pa. 1994) ...................................... 45

*In re Momentum Mfg. Corp.*,
25 F.3d 1132 (2d Cir. 1994) ........................................................................................... 11

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) .............................................................................. 27

*In re Movie Gallery*,
Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 7, 2008) ........................................... 21

*In re New Century TRS Holdings, Inc.*,
390 B.R. 140 (Bankr. D. Del. 2008) .............................................................................. 30

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................... 36, 38

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2007)............................................................... 25, 26

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)................................................................. 34

*In re Remy Worldwide Holdings Inc.*,
    No. 07-11481 (Bankr. D. Del. Nov. 20, 2007) ............................................. 33

*In re Rusty Jones, Inc.,* 110 B.R. 362 (Bankr. N.D. Ill. 1990)...................................... 39

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................... 19

*In re Sherwood Square Assoc.*,
    107 B.R. 872 (Bankr. D. Md. 1989) ....................................................... 39

*In re Sound Radio*,
    93 B.R. at 849 (3d Cir. 1997)............................................................ 36

*In re Stone & Webster, Inc.*,
    286 B.R. 532 (Bankr. D.Del. 2002) ....................................................... 25

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ...................................................... 39

*In re Tex. Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988) ........................................................... 11

*In re Texaco Inc.*,
    254 B.R. 536 (Bankr. S.D.N.Y. 2000) .............................................. 11, 38, 45

*In re T-H New Orleans Ltd. P'ship*,
    116 F.3d 790 (5th Cir. 1997) ............................................................ 45

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984).................................................... 39

*In re Trans World Airlines, Inc.*,
    No. 01-00056 (Bankr. D. Del. June 14, 2002).............................................. 32

*In re U.S. Truck Co., Inc.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ....................... 45, 46

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983) ......................................................................................... 30

*In re World Health Alternatives, Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ............................................................................. 30

*In re WorldCom, Inc.*,
   2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) ....................................................... 45

*Internal Revenue Serv. v. Kaplan (In re Kaplan)*,
   104 F.3d 589 (3d Cir. 1997) .......................................................................................... 45

*Krystal-Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003) .......................................................................................... 11

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) ....................................................................................................... 36

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988) ....................................................................................................... 49

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988) .......................................................................................... 11

*United States v. Energy Res. Co., Inc.*,
   495 U.S. 545 (1990) ....................................................................................................... 45

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
   518 U.S. 213 (1996) ....................................................................................................... 41

**Statutes**

11 U.S.C. § 101(31) ................................................................................................................ 38

11 U.S.C. § 105 ....................................................................................................................... 26

11 U.S.C. § 1114 ..................................................................................................................... 48

11 U.S.C. § 1122(a) ................................................................................................................ 20

11 U.S.C. § 1123(a) ............................................................................................... 22, 23, 24, 25

11 U.S.C. § 1123(a)(1) ............................................................................................................ 22

11 U.S.C. § 1123(a)(2) ............................................................................................................ 22

K&E 14581339.5

11 U.S.C. § 1123(a)(3)................................................................................22, 23

11 U.S.C. § 1123(a)(4)................................................................................22, 23

11 U.S.C. § 1123(a)(5)........................................................................22, 23, 24, 25

11 U.S.C. § 1123(a)(5)(C)...............................................................................25

11 U.S.C. § 1123(a)(6)..................................................................................22

11 U.S.C. § 1123(a)(7).........................................................................22, 25, 38

11 U.S.C. § 1123(b).....................................................................................28

11 U.S.C. § 1123(b)(1)..................................................................................28

11 U.S.C. § 1123(b)(2)..............................................................................28, 29

11 U.S.C. § 1123(b)(3)..................................................................................30

11 U.S.C. § 1123(b)(3)(A)...............................................................................30

11 U.S.C. § 1123(b)(5)..................................................................................29

11 U.S.C. § 1123(b)(6)..................................................................................29

11 U.S.C. § 1125(a)(1)..................................................................................11

11 U.S.C. § 1126.......................................................................................35

11 U.S.C. § 1126(b)(2)..................................................................................11

11 U.S.C. § 1126(c).....................................................................................42

11 U.S.C. § 1126(d).....................................................................................42

11 U.S.C. § 1128(a)(8)..................................................................................42

11 U.S.C. § 1129(a).....................................................................................48

11 U.S.C. § 1129(a)(10).............................................................................43, 44

11 U.S.C. § 1129(a)(11).............................................................................45, 47

11 U.S.C. § 1129(a)(12)..................................................................................48

11 U.S.C. § 1129(a)(13)..................................................................................48

K&E 14581339.5

11 U.S.C. § 1129(a)(2) ............................................................................................................. 35

11 U.S.C. § 1129(a)(3) ........................................................................................................ 36, 37

11 U.S.C. § 1129(a)(4) ........................................................................................................ 37, 38

11 U.S.C. § 1129(a)(5) ........................................................................................................ 24, 25

11 U.S.C. § 1129(a)(5)(A) ......................................................................................................... 38

11 U.S.C. § 1129(a)(5)(A)(i) ..................................................................................................... 38

11 U.S.C. § 1129(a)(5)(A)(ii) .................................................................................................... 39

11 U.S.C. § 1129(a)(5)(B) ..................................................................................................... 38, 40

11 U.S.C. § 1129(a)(6) ............................................................................................................... 40

11 U.S.C. § 1129(a)(7) ........................................................................................................... 40, 41

11 U.S.C. § 1129(a)(7)(A)(i) ..................................................................................................... 40

11 U.S.C. § 1129(a)(7)(A)(ii) .................................................................................................... 40

11 U.S.C. § 1129(a)(8) ........................................................................................................... passim

11 U.S.C. § 1129(a)(9) ........................................................................................................... 43, 44

11 U.S.C. § 1129(a)(9)(C) ......................................................................................................... 44

11 U.S.C. § 1129(b)(1) ............................................................................................................... 49

11 U.S.C. § 1129(b)(2)(A) ......................................................................................................... 49

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................................. 49, 50

11 U.S.C. § 1129(b)(2)(C)(ii) ................................................................................................. 49, 50

11 U.S.C. § 365 ........................................................................................................................... 29

11 U.S.C. §1129(a)(12) ............................................................................................................... 48

28 U.S.C. § 1930 ........................................................................................................................ 48

K&E 14581339.5

**Page(s)**

**Other Authorities**

Collier on Bankruptcy, 15th Rev. Ed. (2007) .................................................................... 26, 39

H.R. Rep. No. 95-595, 95th Cong., lst Sess. (1977) ............................................................ 19, 35

S. Rep. No. 95-989, 95th Cong., 2d Sess. (1978) ................................................................ 19, 35

**Rules**

Fed. R. Bankr. P. 3017 ............................................................................................................ 13

Fed. R. Bankr. P. 3018 ............................................................................................................ 13

Fed. R. Bankr. P. 9019 ............................................................................................................ 30

K&E 14581339.5

## PRELIMINARY STATEMENT

Source Interlink Companies, Inc. and its affiliated debtors (collectively, the "Debtors") file this memorandum in support of confirmation of their joint prepackaged plan of reorganization and approval of their disclosure statement and solicitation.[2] As the Court is aware, the Debtors are a leading publisher and wholesaler of periodicals and home entertainment products in North America. In recent months, a series of events placed a significant strain on the Debtors' ability to satisfy certain financial covenants provided by their prepetition credit agreements.[3] Among other things, the Debtors' operations were negatively impacted by: (a) the decline in revenues caused primarily by a deteriorating market for print advertising; and (b) increased costs in raw materials used to produce and distribute the Debtors' inventory. These operational difficulties, in turn, created significant difficulties with respect to the Debtors' ability to comply with tightened financial covenants provided by their prepetition credit agreements and severely constrained the Debtors' liquidity.

Despite the implementation of significant cost-reduction initiatives, the Debtors recognized that they would be unable to service their existing debt load over the long-term. As a result, the Debtors, with the assistance of their advisors, undertook significant, arm's-length and good faith negotiations with the Debtors' prepetition secured bank lenders regarding the terms of a consensual and comprehensive balance sheet restructuring. Significantly, all parties to these negotiations recognized that the Debtors' fundamental business operations remain sound, but that the Debtors required a capital structure appropriately geared to their future prospects.

---

[2]     Unless otherwise noted, capitalized terms not defined herein shall have the meanings ascribed to them in the *Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (with Technical Amendments)* [Docket No. 195] (the "Plan"). Contemporaneously with the filing of the Plan, the Debtors' have filed the accompanying disclosure statement to the Plan [Docket No. 197] (the "Disclosure Statement").

[3]     The facts and circumstances describing the Debtors' businesses and the events leading to the filing of the Chapter 11 Cases are set forth more fully in the *Declaration of Douglas J. Bates in Support of First Day Motions* [Docket No. 3] (as amended [Docket No. 66], the "First Day Declaration").

After intensive negotiations, the Debtors reached an agreement with its lenders that contemplates a significant deleveraging of the Debtors' balance sheet (including elimination of $465 million in indebtedness under their unsecured notes and conversion or exchange of approximately $866 million in prepetition secured financing into new common stock and new exit financing, resulting in a total reduction of prepetition debt of approximately $732 million) and a *full recovery* for the Debtors' General Unsecured Creditors. The Debtors' senior noteholders—who are also the Debtors' prepetition secured lenders[4]—have agreed to forego any recovery on account of such claims in order to facilitate the Debtors' swift reorganization. Moreover, the Debtors' Plan incorporates a mechanism by which the Debtors' prepetition indebtedness and postpetition financing will convert into exit financing, thereby ensuring that the Debtors (unlike many other companies reorganizing under chapter 11) will have sufficient liquidity to fully implement the Plan, emerge from bankruptcy in a timely fashion and maintain competitive operations going forward.

With this agreement in hand, the Debtors commenced the solicitation of Class 4 (Term Loan Claims)—the only impaired class of creditors entitled to receive a distribution on account of such claims and vote on the Plan. This solicitation was an overwhelming success. The Plan was accepted by each and every holder of Class 4 (Term Loan Claims).

Having received the unanimous support of this impaired class and, as discussed more fully below, having satisfied the requirements under the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Court and applicable non-bankruptcy law, the Debtors respectfully request that the Court enter an order: (a) approving their Disclosure Statement, solicitation of votes, voting procedures and forms of Ballots; and (b) confirming the Plan.

---

[4]   *See In re Source Interlink Companies, Inc.*, Case No. 09-11424 (KG) (Bankr. D. Del. Apr. 29, 2009), Hr'g. Tr. at 34:21–22.

K&E 14581339.5

## BACKGROUND[5]

### The Debtors

As a leading provider of home entertainment products, the Debtors produce and distribute magazines, DVDs, music CDs, books and related items, to over 100,000 retail locations throughout North America. These retailers typically include leading mass merchandise retailers, grocery stores, bookstore chains, music stores, drug stores and other specialty retailers, as well as e-commerce retailers. In addition, the Debtors produce print and digital content for consumers in North America through its enthusiast media division. In total, the Debtors are capable of offering their customers an array of services, including content authoring and value-added services, which include enthusiast media publications and web-based content, category management, product procurement and fulfillment services, rebate and claims filing services, information services and design and manufacture of in-store product display fixtures.

The Debtors were founded in 1995 as The Source Company to address the growing importance of the checkout counter to the retail industry. Through a series of acquisitions and organic growth, the Debtors established themselves as a leading wholesale distributor of periodicals and home entertainment products. In 2007, the Debtors developed ownership of proprietary content through the acquisition of Primedia Enthusiast Media, Inc. ("Primedia"). As a result of the Primedia acquisition, the Debtors produce and develop media content for 80 publications, 94 websites and over 100 events, television and radio programs and about 400 branded products. The Debtors' portfolio of periodicals include titles such as *Motor Trend*, *Automobile*, *Power & Motoryacht*, *Hot Rod*, *Snowboarder*, *Stereophile*, *Surfer*, *Soap Opera Weekly* and *Soap Opera Digest*.

---

[5]     The facts and circumstances supporting the Background are set forth in the First Day Declaration.

K&E 14581339.5

The 2007 acquisition of Primedia enhanced the Debtors' market presence, but also increased the Debtors' debt load to over $1.3 billion.  Due to the recent economic downturn, advertisers' spending in the Debtors' magazines has significantly decreased, causing the Debtors' to experience declining revenue.  In addition, the rising cost of the raw materials (including, principally paper, ink and fuel) used to produce and distribute magazines and home entertainment products has negatively affected the Debtors' earnings.  As a result of these deteriorating conditions, the Debtors' enterprise value had decreased below the amount of their secured and unsecured debt.[6]  To ensure they maintained competitive and financially sound going forward operations, the Debtors entered into discussions, and ultimately reached agreement, with their prepetition secured lenders regarding a comprehensive balance sheet restructuring as set forth in the Plan.

### The Debtors' Prepetition Indebtedness

The Debtors' principal prepetition capital structure consisted of secured revolving and term loans, subordinated secured trade debt, senior unsecured notes and equity.  As of the Petition Date, the Debtors' total consolidated funded debt was approximately $1.5 billion, consisting of a secured term loan of approximately $866.8 million, a secured revolver drawn in the amount of approximately $159.6 million, subordinated secured trade debt of approximately $70.4 million, approximately $19.0 million of other secured debt and $465 million in principal amount of senior unsecured notes.

*Prepetition Revolver Credit Facility*.  Source Interlink Companies, Inc., as borrower, and each of the other Debtors, as guarantors, Citicorp North America, Inc., as administrative agent (the "Revolving Credit Facility Administrative Agent") and the lenders party thereto (together

---

[6]    *See* Disclosure Statement Art. VI.

K&E 14581339.5

with the Revolving Credit Facility Administrative Agent, the "Revolving Credit Facility Lenders") are parties to that certain Revolver Credit Agreement (as amended, the "Revolving Credit Facility Agreement"), dated as of August 1, 2007.[7] The Revolving Credit Facility Agreement provided for a $300 million revolving credit facility (of which approximately $159.6 million has been drawn as of the Petition Date) (the "Revolving Credit Facility").[8]

The Revolving Credit Facility Lenders maintain (a) a second lien on the Debtors' (i) stock, (ii) equipment, (iii) real estate assets and fixtures (subordinate to any mortgages on such real estate and fixtures) and (iv) general intangibles (relating to such stock, equipment and real estate assets and fixtures) (collectively, the "Fixed Asset Collateral") and (b) a first lien on all of the Debtors' other assets or property, whether real, personal or mixed (collectively, the "Current Asset Collateral").

*Prepetition Term Loan*. Source Interlink Companies, Inc., as borrower, and each of the other Debtors, as guarantors, Citicorp North America, Inc., as administrative agent (the "Term Loan Administrative Agent") and the lenders party thereto (together with the Term Loan Administrative Agent, the "Term Loan Lenders") are parties to that certain term credit agreement (the "Term Loan Agreement"), dated as of August 1, 2007. The Term Loan Agreement provides for an $880 million term loan (of which approximately $866.8 million was outstanding as of the Petition Date) (the "Term Loan," and together with the Revolving Credit Facility, the "Prepetition Loans"). The Debtors made principal payments on the Term Loan totaling $8.8 million during fiscal year 2009 and, to date, have not made any principal payments during the

---

[7]  The Debtors' non-debtor subsidiary, The Source-Canada Corp., is not a guarantor under the Revolving Credit Facility, the Term Loan or the Senior Notes.

[8]  Obligations outstanding under the Revolving Credit Facility were paid in full as part of the Debtors' postpetition financing package and in accordance with paragraph 10(a) of the Court's *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (A) Approving Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Priming and Other Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, (E) Modifying Automatic Stay, and (F) Scheduling a Final Hearing* [Docket No. 61], which was entered by the Court on April 29, 2009.

current fiscal year, which ends on January 31, 2010.  The Term Loan Lenders maintain (a) a first lien on the Fixed Asset Collateral and (b) a second lien on the Current Asset Collateral.

*Subordinated Secured Trade Debt*.  Prior to the Petition Date, the Debtors entered into trade security agreements with certain of their CD/DVD trade vendors.  These trade security agreements grant each secured trade vendor under these agreements a security interest in the inventory that the Secured Trade Vendor distributed or sold to the Debtors and (subject to certain limitations) the proceeds from such inventory (collectively, the "Shared Collateral").  The Shared Collateral is part of the Current Asset Collateral provided to the Revolving Credit Facility and Term Loan Lenders.  The secured trade vendors and the Revolving Credit Facility and Term Loan Administrative Agents entered into certain intercreditor and subordination agreements to subordinate the claims of the secured trade vendors' claims with respect to the Shared Collateral to those of the Revolving Credit Facility and Term Loan Lenders.  As of the Petition Date, the Debtors had $70.4 million of secured trade debt outstanding.

*Other Secured Debt*.  In addition to the Prepetition Loans and the secured trade debt, the Debtors maintain approximately $3.0 million in loans secured by certain of the Debtors' equipment and a $16 million mortgage loan with respect to their Coral Springs, Florida facility.  Proceeds from the sale of any equipment subject to the equipment loans are first attributed to these loans and then to the Term Loan.  Any proceeds from the sale of the Coral Springs facility would be used to pay the mortgage loan prior to being distributed to the Revolving Credit Facility or Term Loan Lenders.

*Senior Notes*.  Source Interlink Companies, Inc., as issuer, and each of the Debtors, as guarantors, and HSBC Bank USA, National Association, as indenture trustee, are parties to that certain indenture, dated as of June 23, 2008.  Under the indenture, the Company issued $465

million in 11.25% senior unsecured notes (the "Senior Notes"). The Senior Notes were issued to the lenders under the $465 million senior subordinated bridge facility that the Debtors had entered into to finance their 2007 acquisition of Primedia.

### The Plan and Solicitation[9]

The Plan will implement a significant de-leveraging of the Debtors' balance sheet through the elimination of $465 million in indebtedness under the Senior Notes and approximately $267 million under the Term Loan. Additionally, under the Plan, Holders of Class 4 (Term Loan Claims), the only Plan voting class, will exchange approximately $866 million in indebtedness they maintain under the Term Loan for (a) 100% of the new common stock ("New Common Stock") to be issued in the holding company that shall hold all of the equity interests in Reorganized Source Interlink Companies, Inc. upon the Effective Date ("HoldCo"); (b) the $200 million HoldCo Loan, a structurally subordinated unsecured loan to be entered into by HoldCo on or prior to the Effective Date; (c) $400 million of the Reorganized Debtors' obligations under the New Term Loan B (including $85 million in obligations provided to Term Loan Lenders that committed funding under the Debtors' DIP Term Loan). In addition, the Debtors' obligations under the $85 million DIP Term Loan will convert into obligations under the New Term Loan A on a dollar for dollar basis.

Further, the Plan provides a ready-built mechanism by which the Debtors will have secured exit financing to facilitate their post-chapter 11 operations and make distributions under the Plan. The Debtors' DIP Revolving Credit Facility will be refinanced through a comparable revolving credit facility (as defined in the Plan, the "Exit Facility"), and the Debtors' DIP Term Loan will convert into obligations under the New Term Loan A as described above. As of the

---

[9]    The following summary is qualified in its entirety by reference to the Plan. In the event of any inconsistency between the summary provided herein and the Plan, the Plan shall control in all respects.

date hereof, the Debtors already have obtained funding commitments from the relevant lenders to provide the funding necessary to implement the transactions contemplated under the Plan.

Allowed priority, secured and general unsecured claims will be paid in full under the Plan. The Debtors will use cash on hand, the proceeds of their exit financing and New Common Stock to fund distributions under the Plan and fund ongoing working capital needs. The Debtors' intercompany interests and claims will be reinstated in accordance with the terms of the Plan. The existing equity interests in Source Interlink Companies will be cancelled.

The Debtors commenced solicitation of the Plan on April 25, 2009 by causing the Disclosure Statement, detailing the Debtor's business, restructuring plan, and the procedures to vote on the Plan; the Plan and the ballots for the creditors to submit their votes (the "Ballots," and together with the Disclosure Statement and the Plan, the "Solicitation Package") to be distributed to Holders of Class 4 (Term Loan Claims), the only class entitled to vote on the Plan. 100% in amount and number of Holders of Class 4 (Term Loan Claims) voted to accept the Plan.[10] On April 27, 2009 (the "Petition Date'), after receiving full support of the Plan for the voting creditors, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to consummate the Debtors' restructuring and the transactions contemplated under the Plan.

## ARGUMENT

This memorandum has three parts. First, the Debtors request approval of the solicitation process and the solicitation materials. Second, the Debtors present their "case in chief" that the Plan satisfies Bankruptcy Code § 1129 and request confirmation of the Plan. Lastly, the Debtors address each of the outstanding objections to confirmation, whether formal or informal. In

---

[10] *See Amended Certification of Alison M. Tearnen With Respect to the Tabulation of Ballots on the Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 181] (the "Voting Declaration") ¶ 11.

addition, the Debtors have filed contemporaneously herewith two declarations in support of the

Plan and will reference the declarations when necessary throughout the memorandum.[11]

## I.  THE COURT SHOULD APPROVE THE DISCLOSURE STATEMENT, SOLICITATION PACKAGE AND SOLICITATION PROCESS.

To determine whether a prepetition solicitation of votes to accept or reject a plan should

be approved, this Court must determine whether the solicitation complied with Bankruptcy Code

§ § 1125 and 1126(b) and Bankruptcy Rules 3017(d), (e) and 3018(b), (c).

### A.  The Debtors' Prepetition Solicitation Complies with the Requirements of Bankruptcy Code § § 1125 and 1126(b).

Bankruptcy Code § 1126(b) governs the acceptance of a plan of reorganization by a

holder of a claim or interest prior to the commencement of a chapter 11 case.  Bankruptcy Code

§ 1126(b) provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan
> before the commencement of the case under this title is deemed to have
> accepted or rejected such plan, as the case may be, if — (1) the solicitation
> of such acceptance or rejection was in compliance with any applicable
> non-bankruptcy law, rule, or regulation governing the adequacy of
> disclosure in connection with such solicitation; or (2) if there is not any
> such law, rule, or regulation, such acceptance or rejection was solicited
> after disclosure to such holder of adequate information, as defined in
> section 1125(a) of this title.[12]

Thus, prepetition solicitation must comply with either generally applicable federal or state

securities laws and regulations (including the registration and disclosure requirements thereof)

or, if such laws and regulations do not apply, the solicited holders must receive "adequate

information" under Bankruptcy Code § 1125.  *See* 7 Alan N. Resnick & Henry J. Sommer, eds.,

COLLIER ON BANKRUPTCY ¶ 1126.03[2][d] (15th rev. ed.).

---

[11]  *See Declaration of Douglas J. Bates in Support of Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (with Technical Amendments)* [Docket No. 199] (the "Bates Declaration") and the *Declaration of Steven G. Panagos in Support of the Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (with Technical Amendments)* [Docket No. 200] (the "Panagos Declaration"), each incorporated by reference herein.

[12]  11 U.S.C. § 1125(g).

**1.  The Debtors' Prepetition Solicitation Was Exempt From the Registration and Disclosure Requirements Otherwise Imposed by Non-bankruptcy Law.**

As noted above, the Debtors' plan provides for the issuance of New Common Stock to Holders of Term Loan Claims.  The Debtors have not filed a registration statement for the New Common Stock under the Securities Act (or any other federal or state securities or "blue sky" laws) with the SEC or any other similar agency.  Nor did the Debtors file a registration statement with respect to the Disclosure Statement used to solicit votes to accept or reject the Plan.

The Debtors submit that the solicitation was in compliance with applicable non-bankruptcy law because the Debtors fall within the exemptions from registration provided by section 4(2) of the Securities Act, exempting the Debtors' prepetition solicitation from the disclosure and registration requirements otherwise imposed by the Securities Act or any similar rules, regulations or statutes.[13]  Section 4(2) creates an exemption from non-bankruptcy securities laws, including otherwise applicable registration requirements, for any transaction not involving a "public offering."  A public offering does not occur (and, as a result, the exemption provided by section 4(2) applies) where the solicited parties are all "Accredited Investors" as defined by Rule 506(d) promulgated under the Securities Act.[14]

Here, there are only 30 Holders of Term Loan Claims, and the Ballots used by the Debtors to solicit acceptance or rejection of the Plan required that each Holder of a Term Loan Claim certify whether or not it was an Accredited Investor under Rule 506(d).[15]  Every single

---

[13]    15 U.S.C. §§ 77a–77aa (as amended) (the "Securities Act").

[14]    17 C.F.R. § 230.501(a).

[15]    *See Order (A) Scheduling an Objection Deadline and Combined Hearing on Their Disclosure Statement and Plan Confirmation, (B) Approving Form and Notice of Confirmation Hearing, (C) Establishing Procedures for Objections to their Plan and Disclosure Statement and (D) Approving Solicitation Procedures and (E) Granting Related Relief* [Docket No. 59], Exhibit 2 (Form of Ballot) (the "Ballot") at Item 2.

Holder certified itself to be an Accredited Investor.[16]  The Debtors therefore submit that their

prepetition solicitation was exempt from registration under non-bankruptcy law pursuant to

section 4(2) of the Securities Act.  Thus, the Court may approve the Debtors' prepetition

solicitation so long as the Holders of Term Loan Claims received adequate information as

defined by Bankruptcy Code § 1125(a).[17]

> **2.      The Disclosure Statement Provides Adequate Information Within the Meaning of Bankruptcy Code § 1125(a).**

Bankruptcy Code § 1126(b)(2) requires the disclosure of "adequate information" as

defined in Bankruptcy Code § 1125(a).  Bankruptcy Code § 1125(a) defines "adequate

information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, including a discussion of the
> potential material Federal tax consequences of the plan to the debtor, any
> successor to the debtor, and a hypothetical investor typical of the holders
> of claims or interests in the case, that would enable such a hypothetical
> investor of the relevant Class to make an informed judgment about the
> plan . . . .[18]

A debtor's disclosure statement must, as a whole, provide information that is "reasonably

practicable" to permit an "informed judgment" by impaired creditors entitled to vote on the

plan.[19]  In examining the adequacy of the information contained in a disclosure statement, the

bankruptcy court has broad discretion.[20]

---

[16]   *See* Voting Declaration ¶ 12.

[17]   11 U.S.C. § 1126(b)(2).

[18]   11 U.S.C. § 1125(a)(1).

[19]   *See, e.g., Krystal-Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Texaco Inc.*, 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000); *Zenith*, 241 B.R. at 99 (noting the importance of considering the audience when determining the adequacy of the disclosure statement).

[20]   *See, e.g., In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005).  The determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).

The Debtors submit that the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code § 1125(a). The Disclosure Statement is extensive and comprehensive. It contains historical information about the Debtors and detailed financial and valuation information. It also contains descriptions of the Debtors' restructuring efforts, the Plan and treatment of classes under the Plan and descriptions of: (a) certain events preceding the commencement of the Chapter 11 Cases; (b) a summary of the Plan, (c) the means for implementation of the Plan; (d) risk factors affecting the Plan; (e) a liquidation analysis setting forth the estimated return that holders of claims and equity interests would receive in a hypothetical chapter 7 case; (f) term sheets for the Exit Facility, the HoldCo Loan, and New Term Loan A and New Term Loan B (collectively, the "New Term Loan"); and (g) securities law and federal tax law consequences of the Plan.

Moreover, the Disclosure Statement was the subject of review and comment by, among others, Holders of Term Loan Claims and their advisors, including counsel and financial advisors to the Term Loan Administrative Agent. These parties represent the significant stakeholders in the Debtors' restructuring and the majority in value of impaired creditors. Given the comprehensive information contained in the Disclosure Statement, the complete lack of objection to the Disclosure Statement from those entitled to vote, the Debtors respectfully submit that the Disclosure Statement contains adequate information and the votes the Debtors solicited with the Disclosure Statement are valid.[21]

---

[21] *See Zenith*, 241 B.R. at 100 (court considered the sophistication of the parties, the wealth of information contained in the disclosure statement and publicly available elsewhere, and the lack of objection *by any party entitled to vote* on the plan, in determining that the disclosure statement contained adequate information and the votes solicited by it were valid.) (emphasis added).

K&E 14581339.5

### B. The Debtors' Solicitation Package and Solicitation Procedures are in Compliance with Bankruptcy Rules 3017 and 3018.

Bankruptcy Rules 3017 and 3018 require, in relevant part, that a debtor transmit its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities and that it afford creditors and equity security holders a reasonable period of time in which to accept or reject the proposed plan.[22] The Debtors respectfully submit that they have met all such requirements.

### 1. The Debtors Have Complied With the Requirements of Bankruptcy Rule 3017(d) and 3018(c).

Bankruptcy Rule 3017(d) requires that, unless a court orders otherwise, a debtor must transmit to all creditors, equity security holders and the United States Trustee:

- the plan, or a court approved summary of the plan;

- the disclosure statement approved by the court;[23]

- notice of the time within which acceptances and rejections of such plan may be filed; and

- such other information as the court may direct including any opinion of the court approving the disclosure statement or a court approved summary of the opinion.[24]

Bankruptcy Rule 3017 also requires that the debtor give notice of the time fixed for filing objections to the proposed disclosure statement and for the hearing on confirmation to all creditors and equity security holders and that a debtor mail a ballot to each creditor and equity security holder entitled to vote on the plan.[25]

---

[22] Fed. R. Bankr. P. 3017 and 3018.

[23] As the instant case involves a prepackaged plan, the Debtors concluded their solicitation prior to approval of the Disclosure Statement by the Court pursuant to Bankruptcy Code § 1126(b).

[24] Fed. R. Bankr. P. 3017(d).

[25] *Id.*

Bankruptcy Rule 3018(c) governs the form of ballot for accepting or rejecting a plan. Rule 3018(c) provides, in relevant part, that an "acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent and conform to the appropriate Official Form."[26] Pursuant to Bankruptcy Rule 3018(b), the Debtors established April 16, 2009 as the record date (the "Record Date") for determining which Holders of Term Loan Claims were entitled to vote to accept or reject the Plan.

### a. The Debtors' Solicitation Package

The Debtors commenced solicitation of the Plan on April 25, 2009 by causing the Solicitation Package to be transmitted to holders of Class 4 (Term Loan Claims) as of the Record Date.[27] All other creditors were either classified in classes entitled to receive no distribution under the Plan and were therefore deemed to have rejected the Plan or unimpaired and therefore conclusively presumed to have accepted the Plan.[28] As required by Bankruptcy Rule 3017(d), the Solicitation Package included the Disclosure Statement, the Plan and Ballots. The Disclosure Statement and Ballots provided clear notice of the voting deadline to submit the Ballots, which the Debtors initially established as April 27, 2009 at 5:00 p.m. (prevailing Eastern Time). During this period, the Debtors, the Term Loan Lenders and the Revolving Credit Facility Lenders continued to negotiate various aspects of the Debtors' proposed postpetition financing and the treatment of the Term Loan Claims. To facilitate these negotiations and ensure that each Holder had sufficient time to fully consider the Plan and Disclosure Statement, the Debtors subsequently extended the voting deadline to April 27, 2009 at 8:15 p.m. (prevailing Eastern

---

[26] Fed. R. Bankr. P. 3018(c); Fed. R. Bank. P. 3017(d) (requiring that the form of ballot conform to the "official form").

[27] *See* Voting Declaration at ¶ 7.

[28] *See* 11 U.S.C. § 1126(f), (g).

K&E 14581339.5

Time) (the "Voting Deadline").[29] Prior to conclusion of the solicitation period, the Debtors, the

Term Loan Lenders and the Revolving Credit Facility Lenders reached agreement on the

material terms of the debtor in possession financing and treatment of the Term Loan Claims, as

indicated in the supplement to the Plan and Disclosure Statement distributed to creditors entitled

to vote on the Plan within the solicitation period.[30]

###### b. *Ballots*

Bankruptcy Rules 3017(d) and 3018(c) require a form of ballot substantially conforming

to Official Form No. 14. The forms for the Ballots in these cases, while based on Official Form

No. 14, have been modified to address the particular circumstances of the Chapter 11 Cases and

to include certain additional information that the Debtors believe relevant and appropriate for

each class of claims or interests entitled to vote.[31]

The Debtors served holders of Class 4 (Term Loan Claims) with Ballots substantially in

the form provided by Official Form No. 14, with certain modifications relevant to the facts and

circumstances of the Chapter 11 Cases.[32] Accordingly, the Debtors respectfully submit that the

forms of the Ballots are adequate and appropriate and should be approved in all respects.

###### 2. The Debtors' Solicitation Satisfied the Requirements of Bankruptcy Rule 3018.

Bankruptcy Rule 3018(b) provides that prepetition acceptances or rejections of a plan are

valid if: (a) the plan was transmitted to substantially all the holders; (b) the solicitation period

---

[29] *See* First Day Declaration ¶ 57; *see also* Voting Declaration ¶ 9 n.2. The Debtors provided an additional extension to one Holder of a Class 4 (Term Loan Claim) to April 28, 2009 at 12:00 p.m. (prevailing Eastern Time). *Id.*

[30] *See*, *e.g.*, First Day Declaration ¶ 57; *Supplement to the Disclosure Statement for the Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 21].

[31] *See* Fed. R. Bankr. P. 3017(d) (debtors shall mail a form of ballot conforming to the appropriate Official Form to creditors and equity security holders).

[32] *See* Ballot.

was not unreasonably short; and (c) the solicitation was in compliance with Bankruptcy Code § 1126(b).[33]  The Debtors' solicitation fully satisfies each element of this standard.

First, as discussed above, the Debtors ensured that all the Holders of all Term Loan Claims (the only class of Claims or Interests entitled to vote to accept or reject the Plan) were provided with the Solicitation Package.[34]  In addition, the Solicitation Package was posted by the Term Loan Administrative Agent to IntraLinks™, the secure website maintained by the Term Loan Lenders at the outset of the solicitation period.  Second, the solicitation period, which lasted from April 25, 2009 through April 27, 2009 at 8:15 p.m. (prevailing Eastern Time), was adequate under the unique facts and circumstances of the Chapter 11 Cases and was not "unreasonably short."  The entirety of Class 4 Claims are held by only 30 affiliates of 8 financial institutions or asset managers under the Term Loan.  Each of these parties had the opportunity to review and provide input on the terms of the Debtors' restructuring either directly, through the Term Loan Administrative Agent or through their own advisors.  The Debtors' discussed the terms and length of the solicitation period with the advisors for the Term Loan Lenders in advance of solicitation.  Significantly, the Plan was unanimously supported by every single Holder of a Term Loan Claim.[35]  Thus, the Debtors respectfully submit that the Solicitation Period was not unreasonably short and should be approved.

Third, as demonstrated above, the solicitation complied with Bankruptcy Code § 1126(b) by providing "adequate information" to the voting class within the meaning of Bankruptcy Code § 1125(a).  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018(b).

---

[33]  Fed. R. Bankr. P. 3018(b).

[34]  *See* Voting Declaration ¶ 6.¶

[35]  *See* Voting Declaration ¶ 11.

3. **The Debtors' Solicitation Procedures Should be Approved Under Bankruptcy Rule 3017(e).**

Bankruptcy Rule 3017(e) provides that the Court "shall consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to beneficial holders of stock, bonds, debentures, notes and other securities, determine the adequacy of the procedures and enter any order the court deems appropriate."[36] Here, the Debtors caused the Solicitation Package to be transmitted to all Holders of Class 4 (Term Loan Claims).[37] All other Holders of Claims or Interests are entitled to receive no distribution on account of such claims or interests are therefore deemed to have rejected the Plan or are unimpaired and are therefore conclusively presumed to have accepted the Plan.[38] The Debtors submit that the Solicitation Procedures were appropriate and the Court should enter an order approving the procedures.

4. **Approval of Procedures for Vote Tabulation.**

The Debtors respectfully request that the Bankruptcy Court approve the voting and tabulation procedures described herein in accordance with Bankruptcy Code § 1126(c) and Bankruptcy Rule 3018(a).

Bankruptcy Code § 1126(c) provides:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

The Debtors request that the Court approve the vote tabulation methodology utilized by the Debtors. The solicitation procedures did not require the Debtors did not count or consider for

---

[36]   Fed. R. Bankr. P. 3017(e).

[37]   *See, e.g.*, Disclosure Statement Art. V; Voting Declaration ¶ 6.

[38]   *See* 11 U.S.C. §§ 1126(f), (g), Plan at Article III.D;

any purpose in determining whether the Plan has been accepted or rejected the following Ballots: (a) any Ballot received after the Voting Deadline (unless the Debtors granted an extension of the Voting Deadline with respect to the holder who casts the Ballot or otherwise agree to waive the timeliness requirement); (b) any Ballot that was illegible or contains insufficient information to permit the identification of the Holder; (c) any Ballot cast by a Person or Entity that did not hold a Claim or Interest in a Class that is entitled to vote on the Plan; (d) any unsigned Ballot; (e) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and (f) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.[39] However, significantly, every Ballot was counted and considered when tabulating votes for the acceptance or rejection of the Debtors' Plan.[40] Further, the Debtors' notice, claims and balloting agent verified the amount of claims voted by such holders of Class 4 (Term Loan Claims) by submitting a summary report to the Term Loan Administrative Agent to verify that the claim amount identified by each holder corresponded to obligations actually held by such holder as of the Record Date.[41]

Based on the facts and arguments set forth in section I of this memorandum, the Debtors submit that the Court should approve the Solicitation Package (including the Disclosure Statement) and the Debtors' solicitation procedures as they satisfy the requirements of Bankruptcy Code §§ 1125 and 1126(b) and Bankruptcy Rules 3017(d), (e) and 3018(b), (c). The foregoing solicitation procedures or those substantially similar have been approved in other

---

[39]    *See* Voting Declaration ¶ 10.

[40]    *See* Voting Declaration ¶ 10, 11.

[41]    *See* Voting Declaration ¶ 10.

prepackaged chapter 11 cases in this and other districts.[42]  Notably, no party has objected to the Solicitation Package or the Debtors' solicitation of the Plan.

Additionally, given the clear evidence of good faith on the part of the parties involved in the solicitation and the Debtors compliance with Bankruptcy Code § 1125, the Debtors request that the Court grant the parties the protections provided under Bankruptcy Code § 1125(e).

## II.  THE COURT SHOULD CONFIRM THE PLAN.

To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of Bankruptcy Code § 1129 by a preponderance of the evidence.[43]  The Debtors submit that the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules and applicable non-bankruptcy law.  In particular, the Plan fully complies with all of the requirements of Bankruptcy Code § § 1122, 1123 and 1129.  This memorandum addresses each requirement individually.

### A.  The Plan Complies With Bankruptcy Code § 1129(a)(1).

Bankruptcy Code § 1129(a)(1) requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[44]  Bankruptcy Code § 1129(a)(1)'s legislative history indicates that this provision requires compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[45]  Accordingly, the determination of whether the Plan complies with Bankruptcy

---

[42]  *See, e.g.*, *In re Portola Packaging, Inc.*, Case No. 08-12001 (CSS) (Bankr. D. Del. Aug. 29, 2008); *In re ACG Holdings, Inc.*, Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); *In re Vertis Holdings, Inc.*, Case No. 08-11460 (CSS) (Bankr. D. Del. July 16, 2008); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008).

[43]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606 n.23 (Bankr. D. Del. 2001).

[44]  11 U.S.C. § 1129(a)(1).

[45]  *See In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) (determining that provisions of § 1129(a)(1) are more directly aimed at sections 1122 and 1123); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., lst Sess. 412 (1977).

K&E 14581339.5

Code § 1129(a)(1) requires an analysis of Bankruptcy Code § § 1122 and 1123.  As explained below, the Plan complies with these sections in all respects.

### 1.    The Plan Satisfies the Classification Requirements of Bankruptcy Code § 1122.[46]

Bankruptcy Code § 1122 provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[47]  Claims or interests in a class need not be identical, but rather should be similar in legal nature or effect with respect to each other.[48]  Bankruptcy Code § 1122 provides plan proponents with considerable flexibility to place similar claims into different classes, provided there is a rational basis to do so.[49]  Courts have identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights;[50] and (b) where there are good business reasons for separate classification.[51]

---

[46]    *See* Bates Declaration ¶ ¶ 3-4.

[47]    11 U.S.C. § 1122(a).

[48]    *See In re DRW Prop. Co. 82*, 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).  Bankruptcy Code § 1122 likewise does not require classifying claims together simply because they may share some attributes.  *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of [Bankruptcy Code § 1122] explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.").

[49]    *See Jersey City*, 817 F.2d at 1060-61 (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Boston Post Rd. L.P. v. FDIC (In re Boston Post Road, L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994) (finding that courts cannot prohibit separate classification of substantially similar claims); *Frito-Lay, Inc., v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan").

[50]    *See, e.g.*, *In re Kaiser Aluminum Corp.*, No. 02-10429 (JFK), 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights); *see also Heritage*, 375 B.R. at 299 n.86 (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate).

[51]    *See, e.g.*, *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that debtor must have a legitimate business reason supported by credible proof to justify separate classification of unsecured claims); *Bally*, 2007 WL 2779438, at *3; *see also Heritage*, 375 B.R. at 303 (recognizing separate classification of claims of equal rank and priority for valid business reasons, including where a particular group of claimants have non-creditor interests that may affect its voting on the plan); *In re Magnatrax Corp.*, Case No. 09-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003) (permitting separate classification based on valid business, factual, and legislative reasons).

The Plan's classification of claims and interests into ten classes satisfies the requirements of Bankruptcy Code § 1122 because each class is different in a legal or factual nature or based on other relevant criteria and further, each of the claims or interests within a particular class is substantially similar to the other claims or interests in such class.

In general, the Plan's classification scheme follows the Debtors' prepetition capital structure. The Plan classifies the Debtors' prepetition secured debt separately from their unsecured debt. The Plan divides the Debtors' issuances of prepetition secured debt into three separate classes based on the applicable collateral securing such claims and the relevant agreements giving rise to such claims: Class 3 (Revolving Credit Facility Claims), Class 4 (Term Loan Claims) and Class 2 (Other Secured Claims).[52] Likewise, the Plan classifies unsecured claims against the Debtors according to their legal nature by classifying Class 5 (Senior Notes Claims) separately from other unsecured claims and claims subordinated pursuant to Bankruptcy Code § 510(b) separately from general unsecured claims. Class 7 (Intercompany Claims) (essentially claims between relevant Debtor entities as provided by the Debtors' books and records) are classified separately because they do not involve third-party creditors. Class 8 (Intercompany Interests) and Class 10 (Equity Interests in Source Interlink Companies) also are classified separately, rationally divided between interests held by third parties and those held by the Debtors.[53]

---

[52]   *See* Plan Art. III.A.2; *In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1338 (9th Cir. 1985) (holding that separate classification of secured claims is appropriate); *In re Dilts*, 126 B.R. 470, 472 (Bankr. W.D. Pa. 1991) (classification of secured claims is determined on the basis of priority, nature of collateral, and agreements among creditors with respect to subordination).

[53]   *See In re Movie Gallery*, Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 7, 2008) [Docket No. 2191] (confirmed plan of reorganization that separated intercompany interests from equity interests and provides that Equity Interests will be impaired but intercompany interests will emerge from chapter 11 unaltered.); *In re Focal Comm'cns Corp.*, Case No. 02-13709 (MFW) (Bankr. D. Del. Apr. 30, 2003) [Docket No. 894] (confirmed plan of reorganization provides that intercompany interests will survive chapter 11 reorganization unimpaired).

K&E 14581339.5

Thus, in each instance of separate classification, the Plan classifies claims based upon their different rights and attributes. Accordingly, the Plan satisfies Bankruptcy Code § 1122.

## 2. The Plan Satisfies the Seven Mandatory Plan Requirements of Bankruptcy Code §§ 1123(a)(1) - (a)(7).[54]

The Plan meets the seven mandatory requirements of Bankruptcy Code § 1123(a). Specifically, sections 1123(a)(1)-(7) require that a plan:

(a) designate classes of claims and interests;

(b) specify unimpaired classes of claims and interests;

(c) specify treatment of impaired classes of claims and interests;

(d) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

(e) provide adequate means for the plan's implementation;

(f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[55]

Article III.A. of the Plan satisfies the <u>first three requirements</u> of Bankruptcy Code § 1123(a) by: (a) designating classes of claims and interests, thereby satisfying Bankruptcy Code § 1123(a)(1);[56] (b) specifying the classes of claims and interests that are unimpaired under the Plan, thereby satisfying Bankruptcy Code § 1123(a)(2);[57] and (c) specifying the treatment of

---

[54] *See* Bates Declaration ¶¶ 5-8.

[55] *See* 11 U.S.C. § 1123(a)(1)-(7).

[56] *See* Plan Art. III.A.2.

[57] *See id.*

each class of claims and interests that is impaired, thereby satisfying Bankruptcy Code § 1123(a)(3).[58]

The Plan also satisfies section 1123(a)(4) — the <u>fourth</u> mandatory requirement — because the treatment of each claim or interest within a class is the same as the treatment of each other claim or interest in that class.

Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the <u>fifth</u> requirement of Bankruptcy Code § 1123(a).[59]  Article IV of the Plan and the various documents included in the supplement to the Plan (the "Plan Supplement") provide for, among other things:  (a) the substantive consolidation of the Debtors and their subsidiaries for all purposes associated with Confirmation and Consummation; (b) causing HoldCo to hold 100% of the Reorganized Source Interlink Companies Equity interests upon the Effective Date; (c) the continued corporate existence of the Debtors; (d) generally allowing for all corporate action necessary to effectuate the Plan, including the assumption of executory contracts, appointment of the directors and officers of the Reorganized Debtors and HoldCo, execution and entry into the Exit Facility, HoldCo Loan and New Term Loan and the commitment letters related thereto and the issuance and distribution of the New Common Stock required to be issued pursuant to the Plan; (e) the adoption and filing of amended certificates of incorporation and by-laws; (f) cancellation of the senior note indenture and any other Certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors; (g) cancellation of liens securing any secured claim; and (h) preservation of certain of the Debtors' Causes of Action.

---

[58]  *See* Plan Art. III.B.

[59]  11 U.S.C. § 1123(a)(5).

K&E 14581339.5

In addition, prior to filing this memorandum, the Debtors published in their Plan Supplement many of the documents necessary to implement the Plan, including: (a) amended certificates of incorporation and by-laws or a description thereof; (b) description of the Shareholders Agreement; (c) list of executory contracts and unexpired leases to be rejected; (d) non-exclusive list of Causes of Action to be retained by the Reorganized Debtors; (e) disclosures of HoldCo and Reorganized Debtors' directors and officers as required by Bankruptcy Code § 1129(a)(5); and (f) description of HoldCo's acquiring and holding 100% of the Reorganized Source Interlink Companies Equity Interests.[60] The Debtors caused notice of the Plan Supplement to be served on parties in interest.[61]

The Plan, together with the documents and agreements contemplated thereby, including the Plan Supplement, provide the means for implementation of the Plan as required by Bankruptcy Code § 1123(a)(5).

The Plan also satisfies the <u>sixth</u> requirement of section 1123(a) — *i.e.*, that a plan prohibit the issuance of non-voting equity securities.[62] In particular, the drafts of the amended certificates of incorporation included as part of the Plan Supplement prohibit the issuance of non-voting equity securities.

Finally, the Plan fulfills section 1123(a)'s <u>seventh</u> element, which requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or

---

[60] *See* Plan Supplement [Docket Nos. 136 and 201]; *see also* Bates Declaration ¶¶ 16-17. As set forth in Article I.A.97 of the Plan, the definition of Plan Supplement has been modified to exclude the execution versions of the Debtors' exit financing agreements. The Debtors' Disclosure Statement contained detailed term sheets related to the Debtors' exit financing arrangements, which have been committed to by the exit lenders. *See* Docket Nos. 19, 21. Negotiation of the execution versions of the exit financing documents is well advanced and will be finalized as part of Consummation of the Plan.

[61] *See Aff. of Service of Katrina Givens re Plan Supplement for Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 153].

[62] *See* 11 U.S.C. 11239(a)(6).

K&E 14581339.5

trustee . . . ."[63]  This provision is supplemented by Bankruptcy Code § 1129(a)(5), which directs

a court to scrutinize the methods by which the management of the reorganized company is to be

chosen in order to provide adequate representation of those whose investments are involved in

the reorganization.  The manner of selecting the officers and directors of the Reorganized

Debtors and HoldCo under the Plan and as set forth in documents included in the Plan

Supplement is consistent with Delaware corporate law, the Bankruptcy Code, the interests of

creditors and equity security holders and public policy.  Importantly, as they will cumulatively

hold all of the New Common Stock, the Holders of Class 4 (Term Loan Claims) participated in

the selection of directors and officers of HoldCo.  Therefore, the Court should find that the Plan

satisfies the requirements of Bankruptcy Code § 1123(a)(7).

### 3.  Substantive Consolidation Is Justified by the Facts and Circumstances Herein.[64]

As permitted by the Bankruptcy Code § 1123(a)(5), Article IV.B. of the Plan provides

that the estate of each of the Debtors will be substantively consolidated into a single consolidated

estate for purposes primarily of voting and distribution associated with the Plan.[65]  As a result of

substantive consolidation, among other things, all assets and liabilities of the Debtors will be

treated for Plan purposes as though they were merged into one estate for purposes of the Plan

only.[66]  The Debtors' substantive consolidation as contemplated in the Plan is limited and

functions to facilitate making distributions to creditors in satisfaction of their Claims.  The

---

[63]  11 U.S.C. § 1123(a)(7).

[64]  *See* Bates Declaration ¶ 10.

[65]  Section 1123(a) provides, in relevant part: "(a) Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall (5) provide adequate means for the plan's implementation . . . such as (C) merger or consolidation of the debtor with one or more persons . . ." 11 U.S.C. § 1123(a)(5)(C); *see In re Stone & Webster, Inc.*, 286 B.R. 532, 540-41 (Bankr. D.Del. 2002) (section 1123(a)(5) of the Bankruptcy Code authorizes substantive consolidation).

[66]  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007); *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir 2005).

K&E 14581339.5

Debtors will not collapse their separate corporate entities as part of the substantive consolidation contemplated in the Plan.

Authority for substantive consolidation comes from a bankruptcy court's general equitable powers under Bankruptcy Code § 105.[67] The Third Circuit, in *Owens Corning*,[68] held that, *absent consent*, for substantive consolidation, the debtor must prove for the relevant entities that (a) prepetition they disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity *or* (b) postpetition their assets and liabilities are so intertwined that separating them is prohibitive and hurts all creditors.[69] Notably, the *Owens Corning* court provided that creditors may consent to substantive consolidation and expressly held that satisfaction of either prong is sufficient to justify substantive consolidation over creditors' objections.[70] When deciding whether to allow substantive consolidation, rather than endorsing any preset factors, the Third Circuit has "adopt[ed] an intentionally open-ended, equitable inquiry . . . to determine when substantively to consolidate two entities."[71] Because it is an equitable remedy, substantive consolidation should be used to afford creditors equitable treatment, and, therefore, may be ordered when the benefits to creditors from substantive consolidation exceed the harm suffered.[72] Class 4 (Term Loan

---

[67] *See, e.g., FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992); *In re Leslie Fay Co*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); 2 Collier on Bankruptcy, 15th Rev. Ed. (2007), 105.09[1][b] ("[T]he authority of a bankruptcy court to order substantive consolidation derives from its general discretionary equitable powers.").

[68] 419 F.3d 195 (3d Cir. 2007).

[69] *Owens Corning*, 419 F.3d at 211 (adopting the reasoning and holding of *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988)).

[70] *Id.* at 212.

[71] *Id.* at 210.

[72] *Augie/Restivo*, 860 F.2d at 518-19.

Claims), the impaired class of claims entitled to vote on the Plan, has voted in favor of the Plan, satisfying the *Owens Corning* consent standard.[73]

The Debtors believe substantive consolidation for Plan purposes is warranted in light of the degree to which the Debtors and their creditors depend upon the integration of the Debtors' collective operations and the criteria established by courts in ruling on the propriety of substantive consolidation in other cases. Substantive consolidation as proposed in the Plan is appropriate and equitable in this case. For example, all of the Debtors either are borrowers or guarantors under the Revolving Credit Facility, the Term Loan and the DIP Facilities.[74] Substantially all of the assets of the Debtors were pledged to secure the Debtors' prepetition secured indebtedness.[75] Also, the Debtors operate their businesses and make management and operational decisions on a collective basis.[76] Most, if not all, of the Debtors have many of the same directors and officers.[77] Furthermore, the Debtors prepared and filed consolidated income tax returns and made available to the public consolidated financial reports and SEC filings.[78] In sum, the Debtors' businesses were and are mutually dependent and operated, in many respects, as segments of a single common enterprise.

Moreover, every single creditor entitled to vote to accept or reject the Plan (*i.e.*, Holders of Class 4 (Term Loan Claims)) knowingly accepted the Plan. Each of these creditors were informed that the Plan contemplated substantive consolidation. The Debtors' Disclosure

---

[73] As shown by the liquidation analysis, the Holders of Claims in Class 5 (Senior Notes Claims), Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests in Source Interlink Companies), who are entitled to receive nothing under the Plan and were not entitled to vote, are substantially "out of the money," and substantive consolidation is a non-event for them. *See In re Monroe Well Serv., Inc.*, 80 B.R. 324, 331 (Bankr. E.D. Pa. 1987).

[74] *See, e.g.*, First Day Declaration ¶¶ 35, 37; Disclosure Statement Exhibit E; Bates Declaration ¶ 10.

[75] *See* First Day Declaration ¶ 39. The Debtors' only non-debtor subsidiary, The Source-Canada Corp., is not a borrower or guarantor under the Debtors' prepetition credit facilities. However, 65% of the voting stock in The Source-Canada Corp. is pledged as collateral to secure the Debtors' indebtedness under those facilities.

[76] *See, e.g.*, Disclosure Statement Art. IV.C. 2; Bates Declaration ¶ 10.

[77] *See id.*

[78] *See id.*

Statement highlighted the fact that substantive consolidation was one of the means by which the Debtors intended to implement their Plan.[79]  The Ballots also disclosed that the Plan contemplated the use of substantive consolidation and, by signing the Ballot, each creditor certified its understanding and acknowledgment that the Debtors sought to implement their Plan through substantive consolidation.[80]  Again, each of these parties voted to accept the Plan on this basis.

In light of the foregoing, the Debtors believe that no creditor would be prejudiced by the Debtors' substantive consolidation as contemplated in the Plan.  The Debtors further believe that such substantive consolidation will best utilize the Debtors' assets and maximize potential distributions to all creditors of the consolidated estates and should be approved by this Court.

### 4.    Discretionary Contents Of The Plan.

Bankruptcy Code § 1123(b) identifies various discretionary provisions that a plan of reorganization may include, but is not required to include.  Each provision of the Plan is consistent with this section.[81]

For example, Bankruptcy Code § 1123(b)(1) provides that a plan may impair or leave unimpaired any class of claims or interests.[82]  Here, claims and interests in Classes 1, 2, 3, 6, 7 and 8 are unimpaired and Classes 4, 5, 9 and 10 are impaired.[83]  As such, the Plan is consistent with Bankruptcy Code § 1123(b)(1).

Bankruptcy Code § 1123(b)(2) permits a plan to provide for the assumption, assumption and assignment and rejection of executory contracts and unexpired leases pursuant to Bankruptcy

---

[79]    *See* Disclosure Statement at IV.C.2.

[80]    *See* Ballot at Item 5(10).

[81]    *See* Bates Declaration ¶ 9.

[82]    11 U.S.C. § 1123(b)(1).

[83]    *See* Plan Art. III.A.2.

Code § 365.  Article V.A. of the Plan provides that, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease (a) was assumed or rejected previously by the Debtors, (c) previously expired or terminated pursuant to its own terms, (d) is the subject of a motion to reject filed on or before the Effective Date or (d) is set forth in a schedule, as an Executory Contract or Unexpired Lease to be rejected, filed as part of the Plan Supplement or in the amendments thereof.[84]  This provision of the Plan is permitted under Bankruptcy Code § 1123(b)(2).[85]

Finally, under Bankruptcy Code § 1123(a)(6), a plan may "include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code."[86]  Pursuant to this section, the Debtors have included certain exculpation, release and injunction provisions in the Plan.[87]  The Debtors believe that such provisions are particularly appropriate in the Chapter 11 Cases because they are supported by the facts and circumstances of the case and are the product of extensive review by the Debtors, their prepetition secured lenders and the holders of the Debtors' Senior Notes.  The Debtors address the appropriateness of each of these provisions in turn.[88]

---

[84]  *See* Plan Art. V.A.

[85]  *See* 11 U.S.C. § 1123(b)(2).

[86]  11 U.S.C. § 1123(b)(5)-(6).

[87]  *See* Plan Art. VIII.D., E., F & H.; *see also In re Armstrong World Indus., Inc.*, 348 B.R. at 230 (confirming plan of reorganization containing release, exculpation, and indemnification provisions).

[88]  The injunction provision simply implements the release and exculpation provisions.  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision also must be appropriate.

K&E 14581339.5

### a. *The Debtor Release*

As contemplated by Bankruptcy Code § 1123(b)(3)(A), which permits a debtor to include settlement of a debtor's claims as discretionary provisions in a plan of reorganization,[89] Article VII.D. of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights and causes of actions that the Debtors may have against, among others, (a) their current officers, directors and managers; (b) the Revolving Credit Facility Agents; (c) the Revolving Credit Facility Lenders; (d) the Term Loan Agents; (e) the Term Loan Lenders; (f) the DIP Agents; (g) the DIP Lenders; and (h) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, current and former members (including ex officio members), officers, directors, employees, partners and affiliates of each of the foregoing. The Debtors have proposed the releases based on their business judgment and the releases easily meet the standard—to the extent applicable—for Court-approved settlements, which requires that a settlement "exceed the lowest point in the range of reasonableness" to be approved.[90] The Debtors simply propose to release those parties that have participated in good-faith negotiations and helped implement the comprehensive restructuring plan through, among other things, resolution of their outstanding claims.[91]

Additionally, where a debtor releases claims against non-debtors under a Plan, the Court may examine additional factors to determine whether such a release is appropriate. These factors include: "(1) an identity of interest between the debtor and non-debtor such that a suit against

---

[89] *See* 11 U.S.C. § 1123(b)(3). *But see In re Coram Healthcare Corp.*, 315 B.R. 321, 334-36 (Bankr. D. Del. 2004) (applying Bankruptcy Rule 9019 standard to debtor releases under a plan).

[90] *In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 168 (Bankr. D. Del. 2008); *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006).

[91] *See* 11 U.S.C. § 1123(b)(3)(A); *see* Bates Declaration ¶ 11.

the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; (5) the payment of all or substantially all of the claims of creditors and interest holders under the plan."[92]

Each of these factors weigh in favor of the releases provided by Article VIII.D. of the Plan. Clearly, the non-debtors have all provided substantial benefits to the Debtors' reorganization. The Debtors' prepetition lenders have provided the Debtors with significant liquidity, allowing the Debtors to implement a Plan that allows the overwhelming majority of their unsecured creditors to be paid in full. Indeed, the only unsecured creditors that will not be paid in full under the Plan (*i.e.*, Holders of Senior Notes Claims) are in fact the Debtors' prepetition lenders.[93] Moreover, the release provision was subject to extensive review by the Debtors' prepetition lenders (the future owners of the business) and was unanimously approved, as evidenced by the 100% acceptance of the Plan.

Based on the settlements embodied in this Plan, the Debtors believe that pursuing any such claims against the Debtor Releasees and Third Party Releasees would not be in the best interest of the Debtors' various constituencies and that the costs involved likely would outweigh any potential benefit from pursuing such claims. Finally, the Debtors' release of claims is a component of the consensual Plan process. The Debtors have evaluated their claims against the Debtor Releasees and Third Party Releasees and do not believe any constructive purpose would be furthered by preserving or seeking to prosecute any claims, causes of action or liabilities against the Debtor Releasees or Third Party Releasees.

---

[92]    *Coram Healthcare*, 315 B.R. at 335; *see In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

[93]    *See supra* note 4.

K&E 14581339.5

### b. *The Third Party Release*

The Third Party Release provided by Article VIII.E. of the Plan provides that the Releasing Parties, including: (a) the Revolving Credit Facility Agents; (b) the Revolving Credit Facility Lenders; (c) the Term Loan Agents; (d) the Term Loan Lenders; (e) the DIP Agents; (f) the DIP Lenders; and (g) all Holders of Claims or Equity Interests except Holders of Claims or Equity Interests who (i) vote to reject the Plan, (ii) do not vote to accept or reject the Plan but who timely submit a Release Opt-Out Form indicating their decision not to participate in the Third Party Release or (iii) are in a class deemed to reject the Plan shall provide a full discharge and release (and shall be deemed to have provided a full discharge and release) to the Third Party Releasees and the Debtor Releasees from any and all causes of action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan, as set forth more fully in Article VIII.E. of the Plan. Significantly, the Third Party Release does not release any claims or causes of action held by Holders of Claims or Equity Interests who voted to reject the Plan or were deemed to reject the Plan.

The Third Party Release is consensual, since no party will provide a release if it voted to reject the Plan, is in a class deemed to reject the Plan or otherwise abstains from voting on the Plan and timely submits a release opt-out form.[94] Conversely, all other parties have voluntarily elected to participate in the third party release (by voting on the Plan or accepting the

---

[94] *See id.; see also In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding that release binding "only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release" was "purely consensual"); Hr'g Tr. at 13:8–11, *In re Trans World Airlines, Inc.*, No. 01-00056 (Bankr. D. Del. June 14, 2002) ("In this case, the claimants agreed by the simple act of not saying no.").

K&E 14581339.5

distributions provided by the Plan). Courts in the Third Circuit have consistently approved consensual releases of similarly situated parties.[95] All parties in interest have received adequate notice of the Third Party Release and have had sufficient time to raise any objections thereto. Although certain objections were filed to the Third Party Release, the Debtors have provided sufficient basis for the Court to overrule all such objections, as further provided in section III, below. Accordingly, the Third Party Release should be approved.

### c. *Exculpation*

In requesting that the Court approve the Exculpation in Article VIII.F. of the Plan, the Debtors are essentially asking the Court to make a finding of fact that the Exculpated Parties, which include: (a) the Debtors; (b) the Reorganized Debtors; (c) the Debtor Releasees; (d) the Indenture Trustee; (e) the Third Party Releasees; and (f) all of the current and former members (including ex officio members), officers, directors, managers, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such), have participated in good faith with respect to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.[96]

---

[95] *See, e.g., Exide*, 303 B.R. at 74; *Coram Healthcare*, 315 B.R. at 336; *Zenith*, 241 B.R. at 111; *see also In re Hines Horticulture, Inc.*, Case No. 08-11922 (Bankr. D. Del. Jan. 28, 2009) [Docket No. 522]; *In re ACG Holdings, Inc.*, Case No. 08-11467 (Bankr. D. Del. Aug. 26, 2008); *In re Hilex Poly Co.*, Case No. 08-10890 (Bankr. D. Del. June 26, 2008); *In re Remy Worldwide Holdings Inc.*, No. 07-11481 (Bankr. D. Del. Nov. 20, 2007); *In re Foamex Int'l Inc.*, No. 05-12685 (Bankr. D. Del. Feb. 1, 2007).

[96] See Plan Art. XIII.F.; Bates Declaration ¶ 13.

An exculpation provision is not a mandatory release of all liability, but instead, establishes the appropriate standard of liability with respect to the parties exculpated.[97] Consequently, the Debtors request that the Court approve the Exculpation and adopt the appropriate standard of liability for the exculpated parties with respect to the Chapter 11 Cases. The exculpation provisions set forth in the Plan do not amount to a release, but rather represent a conclusion of law that flows inevitably from several different findings of fact that the Court must reach in confirming the Plan.

The exculpation provision is appropriate and vital under the circumstances of the Chapter 11 Cases because it provides protection to those interested parties who were essential to the Debtors' consensual restructuring and who exercised good faith in negotiating and implementing the restructuring. The Third Circuit has held that exculpation provisions similar to those proposed in the Plan are appropriate where, as here, the Exculpated Parties have acted in good faith in negotiating and implementing a plan of reorganization.[98] Moreover, the exculpation provision is necessary to protect parties who have made substantial contributions to the Debtors' reorganization from future collateral attacks related to actions taken in good faith in connection with the Debtors' restructuring.[99] The Debtors believe—and there are no allegations to the contrary—that the Exculpated Parties have participated in the Debtors' reorganization in good faith.[100] Further, the scope of the Exculpation is targeted specifically to actions relevant to the reorganization and will have no effect on liability that is determined by Final Order to be the

---

[97] *See In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability."); *see also In re Enron Corp.*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (in finding creditors' appeal of confirmation based on the plan's exculpation provision moot, the court specifically noted that the bankruptcy court addressed the exculpation provision and found it appropriate because it excluded gross negligence and willful misconduct).

[98] *See In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

[99] *See* Bates Declaration ¶ 13.

[100] *See id.*

result of gross negligence or willful misconduct.[101]  Thus, Exculpation should be approved in connection with the Plan.

### d.  *Injunction*

Article VIII.H. of the Plan provides that all parties are permanently enjoined from pursuing any claim or liability or otherwise commencing or continuing any cause of action that has been released, discharged or exculpated (but only to the extent of the Exculpation provided by the Plan).[102]  This injunction is necessary to preserve and enforce the Debtor Release, the Third Party Release and the Exculpation provided by the Plan, and it is narrowly tailored to achieve this purpose.  Accordingly, these injunction provisions should be approved.[103]

### B.  The Debtors Have Complied Fully With the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

The Debtors have satisfied Bankruptcy Code § 1129(a)(2), which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[104]  Bankruptcy Code § 1129(a)(2)'s legislative history explains that the provision requires a court to find that a chapter 11 plan has met the section 1125 adequate disclosure and section 1126 solicitation requirements.[105]  As discussed in Section I above, the Debtors have complied with all applicable disclosure and solicitation requirements of Bankruptcy Code § § 1125 and 1126.

---

[101]  *See* Plan at VIII.F.

[102]  *See id.* at VIII.H.

[103]  *See id.*

[104]  *See PWS Holding*, 228 F.3d at 248.

[105]  *See* H.R. Rep. No. 95-595, at 412 ; S. Rep. No. 95-989, at 126.

## C. The Plan Has Been Proposed in Good Faith and not by any Means Forbidden by Law (Section 1129(a)(3)).[106]

Bankruptcy Code § 1129(a)(3) requires a plan to have been "proposed in good faith and not by any means forbidden by law."[107]  The good faith standard requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."[108]  In determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying any hard and inflexible rules, but should instead evaluate each case on its own merits.[109]

The fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[110]  Courts look to the reorganization plan itself to determine whether the plan seeks relief consistent with the Bankruptcy Code.[111]  Thus, where the plan proponent proposes the plan with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the plan proponent satisfies the good faith requirement of Bankruptcy Code § 1129(a)(3).[112]

Here, the Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business and maximizing the value of each of the

---

[106]   *See* Bates Declaration ¶ 15.

[107]   11 U.S.C. § 1129(a)(3).

[108]   *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citations omitted).

[109]   *See In re Century Glove*, Civ. A Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) (good faith should be evaluated in light of the totality of the circumstances surrounding confirmation).

[110]   *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *see also B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

[111]   *See In re Sound Radio*, 93 B.R. at 849, 854 (3d Cir. 1997).

[112]   *See In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

K&E 14581339.5

Debtors and the recovery to creditors and stakeholders.[113]  In particular, the Plan promotes the

rehabilitative objectives and purposes of the Bankruptcy Code by de-leveraging the Reorganized

Debtors' balance sheets while paying trade creditors in full.  Indeed, the Plan is the culmination

of significant arm's-length negotiations among the Debtors and their prepetition lenders.[114]

Accordingly, the Debtors respectfully submit that the Plan satisfies Bankruptcy Code

§ 1129(a)(3).

### D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)).

Bankruptcy Code § 1129(a)(4) requires that the court approve as reasonable certain

professional fees and expenses paid by the plan proponent, by the debtor or by a person issuing

securities or acquiring property under the Plan.[115]  Put simply, the Debtors must disclose to the

Court all professional fees and expenses and such professional fees and expenses must be subject

to the Court's approval.[116]

Here, all payments the Debtors have made or will make for services or for costs or

expenses in connection with the Chapter 11 Cases, including all Fee Claims, have either already

been approved by the Court or are subject to approval by the Court.  Article II.B.2. of the Plan

further provides that professionals shall file all final requests for payment of claims of

professionals no later than forty-five days after the Effective Date.[117]  After notice and a hearing

in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules

and any applicable order of the Court, the Court shall determine the allowed amounts of such

---

[113]  *See* Bates Declaration ¶ 15.

[114]  *See id.*

[115]  11 U.S.C. § 1129(a)(4).

[116]  *See Lisanti Foods*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a plan should not be confirmed unless fess and expenses related to the revised plan have been approved, or are subject to the approval, of the Bankruptcy Court").

[117]  *See* Plan Art. IX.A.

Claims.[118]  In addition, Article XII.2. of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan. Accordingly, the Plan complies fully with the requirements of Bankruptcy Code § 1129(a)(4) and no party has objected to the Plan on that basis.

### E.     The Debtors Have Disclosed the Post-Emergence Directors and Officers and Their Appointment is Consistent With Public Policy (Section 1129(a)(5)).[119]

The Debtors have complied with all the elements of Bankruptcy Code § 1129(a)(5) (in addition to compliance with the related provisions of section 1123(a)(7), discussed above).  In particular, § 1129(a)(5)(A) requires that prior to confirmation, the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor entities and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[120]  In addition, section 1129(a)(5)(B) requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) the reorganized debtor will employ or retain and the "nature of any compensation for such insider."[121]

The Plan satisfies the first of Bankruptcy Code § 1129(a)(5)'s requirements because the Debtors already have disclosed, in the Plan Supplement,[122] the identities and affiliations of the individuals proposed to serve as HoldCo's directors and officers of the Reorganized Debtors and HoldCo.  Thus, the Plan satisfies section 1129(a)(5)(A)(i).

---

[118]   *See id.*

[119]   *See* Bates Declaration ¶ ¶ 16-17.

[120]   11 U.S.C. § 1129(a)(5)(A).

[121]   11 U.S.C. § 1129(a)(5)(B); s*ee NII Holdings*, 288 B.R. at 363; *Texaco,* 84 B.R. at 908.

[122]   *See* Plan Supplement, Exhibit A.

The proposed directors and officers as set forth in the Plan Supplement also comply with Bankruptcy Code § 1129(a)(5)(A)(ii), which requires that the Court find the appointment or continuance of the proposed directors and officers to be "consistent with the interests of creditors and equity security holders and with public policy."[123] This section asks the Court to ensure that the post-confirmation governance of the Reorganized Debtors and HoldCo is in "good hands," which courts have interpreted to mean: experience in the Reorganized Debtors' business and industry;[124] experience in financial and management matters;[125] that the debtors and creditors believe control of the entity by the proposed individuals will be beneficial;[126] and that does not "perpetuate[] incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor."[127] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[128] Here, the proposed directors and officers are competent, have relevant and solid business and industry experience and will give the Reorganized Debtors and HoldCo both continuity and fresh insights into running the business.[129] And, no one has suggested otherwise. Therefore, section 1129(a)(5)(A)(ii)'s requirements are satisfied.

Finally, through the Plan Supplement, the Debtors have disclosed publicly the identity of all insiders that HoldCo or the Reorganized Debtors will employ or retain and the nature of any

---

[123]  11 U.S.C. § 1129(a)(5)(A)(ii).

[124]  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Rusty Jones, Inc.*, 110 B.R. 362, 372 (Bankr. N.D. Ill. 1990); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

[125]  *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[126]  *See In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[127]  *See In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[128]  7-1129 Collier on Bankruptcy, ¶ 1129.03[5][b].

[129]  *See* Bates Declaration ¶ 16.

K&E 14581339.5

compensation for such insiders in compliance with section 1129(a)(5)(B).[130]  Accordingly, the

Debtors will have satisfied the requirements of Bankruptcy Code § 1129(a)(5).[131]

### F.     The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).

Bankruptcy Code § 1129(a)(6) permits confirmation only if any regulatory commission

that will have jurisdiction over the debtor after confirmation has approved any rate change

provided for in the plan.[132]  Because no regulatory commission has jurisdiction over the

Reorganized Debtors, Bankruptcy Code § 1129(a)(6) is inapplicable to the Chapter 11 Cases.

No party has objected to the Plan's satisfaction of Bankruptcy Code §1129(a)(6).

### G.     The Plan Is In The Best Interests Of Creditors And Interest Holders (Section 1129(a)(7)).[133]

Bankruptcy Code § 1129(a)(7)—the "best interests of creditors test"—requires that, with

respect to each impaired class of claims or interests, each holder of a claim or interest of such

class under the proposed plan on account of such claim or interest:

> (a)     has accepted the plan; or
>
> (b)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.[134]

The best interests test applies to individual dissenting creditors rather than classes of

claims and a debtor generally satisfies the test through a comparison of the estimated recoveries

for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against

---

[130]     *See* Plan Supplement, Exhibit A.

[131]     *See* Bates Declaration ¶ 16.

[132]     11 U.S.C. § 1129(a)(6).

[133]     *See* Panagos Declaration ¶ 6.

[134]     11 U.S.C. § 1129(a)(7)(A)(i)-(ii).

the estimated recoveries under that debtor's plan of reorganization.[135]  As Bankruptcy Code § 1129(a)(7) makes clear, the best interests test applies only to non-accepting impaired claims or interests.  If a class of claims or interests unanimously approves the plan, the best interest test is deemed satisfied for all members of that class.[136]

In this case, with respect to claims and interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Revolving Credit Facility Claims), Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), Bankruptcy Code § 1129(a)(7) is not implicated because the creditors and interest holders in these classes are unimpaired under the Plan.  Moreover, Bankruptcy Code § 1129(a)(7) does not apply to claims in Class 4 (Term Loan Claims) because the members voted unanimously to accept the Plan.  Thus, in this case, the best interests test need only be applied to Class 5 (Senior Note Claims), Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests in Source Interlink Companies), which are impaired and deemed to reject the Plan.

Pursuant to the liquidation and valuation analyses prepared by the Debtors' management with the assistance of Moelis & Company LLC, the Debtors' financial advisors, the estimated recoveries for members of each impaired class under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[137]  The Debtors estimate that the net proceeds available for distribution to stakeholders in a hypothetical chapter 7 liquidation range from $169.6 million to $274.7 million.[138]  These proceeds would be subject to the liens of the Revolving Credit Facility Lenders, the Term Loan Lenders, a first lien mortgage on their Coral

---

[135]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999); *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *Century*, 1993 WL 239489, at *7.

[136]  *Drexel*, 138 B.R. at 761.

[137]  *See, e.g.*, Disclosure Statement Art. VI and Exhibit D; Panagos Declaration ¶ 6.

[138]  *See, e.g.*, Disclosure Statement Exhibit D, Panagos Declaration ¶ 7.

Springs Facility in favor of Wachovia and various equipment and trade liens.[139]  Thus, the

proceeds from a hypothetical chapter 7 would only provide an approximately 9.5% recovery to

the Holders of Class 4 (Term Loan Claims) under a "High Value" recovery, and would provide

no recoveries to junior secured creditors or unsecured creditors.[140]

On the other hand, the Plan pays all claims (except Class 4 (Term Loan Claims), Class 5

(Senior Notes Claims), Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests in Source

Interlink Companies)) in full.  Class 6 (General Unsecured Creditors), who would otherwise

receive no recoveries in a chapter 7 liquidation scenario, will recover 100% of the value of their

claims.  And, as noted above, Holders of Class 5 (Senior Notes Claims)—the only class of

similarly situated unsecured creditors not entitled to a distribution under the Plan—are also the

Debtors' prepetition lenders and have negotiated for and agreed to the treatment provided by the

Plan.[141]  Thus, the Debtors have satisfied the requirements of Bankruptcy Code § 1129(a)(7).

## H. Acceptance of Impaired Classes (Section 1129(a)(8)).[142]

Bankruptcy Code § 1129(a)(8) requires that each class of claims or interests must either

accept a plan or be unimpaired under a plan.[143]  Pursuant to Bankruptcy Code § 1126(c), a class

of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than

one-half in number of the claims in that class actually vote to accept the plan.[144]  Pursuant to

Bankruptcy Code § 1126(d), a class of interests accepts a plan if holders of at least two-thirds in

amount of the allowed interests in that class actually vote to accept the plan.[145]  A class that is

---

[139] *See id.*

[140] *See id.*

[141] *See supra* note 4; *see also* First Day Declaration ¶ 5.

[142] *See* Bates Declaration ¶ 18.

[143] 11 U.S.C. § 1128(a)(8).

[144] 11 U.S.C. § 1126(c).

[145] 11 U.S.C. § 1126(d).

not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[146]  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.[147]

As evidenced in the Voting Declaration, Class 4 , the one impaired class entitled to vote to accept or reject the Plan, unanimously supported the Plan.[148]  Further, Classes 1, 2, 3, 6, 7 and 8 are unimpaired under the Plan and deemed to accept the Plan.[149]  Therefore, the Plan satisfies section 1129(a)(8) with respect to Classes 1, 2, 3, 4, 6, 7 and 8.  However, given that Class 5 (Senior Notes Claims), Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests in Source Interlink Companies) are deemed to have rejected the Plan, the Debtors cannot satisfy Bankruptcy Code § 1129(a)(8) as to those three classes.  Nevertheless, as discussed more fully in Section II.J below, the Plan is confirmable because the Debtors have satisfied the  requirements of Bankruptcy Code § § 1129(a)(10) and 1129(b):  at least one impaired class of claims has accepted the Plan; and the Debtors have met the requirements to "cram down" the rejecting classes (see Section II.N. below).

I.      **The Plan Complies With Statutorily Mandated Treatment Of Administrative And Priority Tax Claims (Section 1129(a)(9)).**

Unless the holder of a particular claim agrees to a different treatment with respect to such claim, Bankruptcy Code § 1129(a)(9) requires the plan to satisfy administrative and priority tax claims in full in cash.

---

[146]    11 U.S.C. § 1126(f).

[147]    11 U.S.C. § 1126(g).

[148]    *See* Voting Declaration ¶ 11.

[149]    *See* Plan Art. III.B.

As required by Bankruptcy Code § 1129(a)(9), Article II.B. of the Plan provides for full payment of allowed Administrative Claims in cash on the Effective Date or in accordance with the terms of the applicable contract or agreement governing such claims. Further, Article II.C. of the Plan provides for full payment of Allowed Priority Tax Claims in accordance with Bankruptcy Code § 1129(a)(9)(C). Therefore, the Debtors submit that the Plan complies with Bankruptcy Code § 1129(a)(9).

### J.   At Least One Impaired Class of Claims has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).[150]

Bankruptcy Code § 1129(a)(10) is an alternative requirement to Bankruptcy Code § 1129(a)(8)'s requirement that each class of claims or interests must either accept the plan or be unimpaired under the plan. Bankruptcy Code § 1129(a)(10) provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[151] Here, the one impaired class entitled to vote to accept or reject the Plan (Class 4 (Term Loan Claims)) unanimously voted to accept the Plan.[152] This class does not include any "insiders" as that term is defined by Bankruptcy Code § 101(31).[153] Therefore, the Plan satisfies the requirements of Bankruptcy Code § 1129(a)(10).

### K.   The Plan Is Feasible (Section 1129(a)(11)).[154]

Pursuant to Bankruptcy Code § 1129(a)(11), a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan,

---

[150]   *See* Bates Declaration ¶ 19; Voting Declaration ¶ 11.

[151]   11 U.S.C. § 1129(a)(10).

[152]   *See* Voting Declaration ¶ 11.

[153]   *See* Bates Declaration ¶ 19

[154]   *See* Panagos Declaration ¶ 12.

unless such liquidation or reorganization is proposed in the plan."[155]  To demonstrate that a plan

is feasible, it is not necessary for a debtor to guarantee success;[156] rather, a debtor must provide

only a reasonable assurance of success.[157]  As described below, and as will be demonstrated at

the Confirmation Hearing, the Plan is feasible under Bankruptcy Code § 1129(a)(11).

While the debtor bears the burden of proving plan feasibility, the applicable standard is

by a preponderance of the evidence, which means presenting proof that a given fact is "more

likely than not."[158]  Further, a number of courts have held that this constitutes a "relatively low

threshold of proof."[159]  Courts have also made clear that "speculative prospects of failure cannot

defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on

feasibility grounds."[160]

In determining standards of feasibility, courts have identified the following probative

factors:

- the adequacy of the capital structure;

- the earning power of the business;

- economic conditions;

- the ability of management;

---

[155]   11 U.S.C. § 1129(a)(11).

[156]   *See United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *Internal Revenue Serv. v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997); *see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[157]   *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("The feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . .  The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts'") (citing *Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978)); *Texaco*, 84 B.R. at 910 ("[a]ll that is required is that there be a reasonable assurance of commercial viability").

[158]   *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1164 (5th Cir. 1993); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *CoreStates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

[159]   *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the plan as a viable undertaking . . ."); *see also Briscoe Enters. Ltd.*, 944 F.2d at 1116 (upholding the bankruptcy court's ruling that a reorganization that had only "a marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required).

[160]   *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *170 (Bankr. S.D.N.Y. 2003).

- the probability of the continuation of the same management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[161]

For purposes of determining whether the Plan satisfies the feasibility requirement, the Debtors thoroughly analyzed their ability post-confirmation to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance.[162]

The Debtors' financial projections reasonably establish that the Debtors will have sufficient cash flow to meet their obligations under the Plan.[163] The proposed Plan, negotiated in good faith between the Debtors and their prepetition lenders has more than a reasonable likelihood of success because the transactions contemplated thereunder will enable the Debtors to continue their current operations and will eliminate a substantial portion of debt.[164]

In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient funding to allow the Debtors to continue to operate their business successfully after emergence and to satisfy all of their obligations under the Plan.[165] To make these payments and to fund their ongoing working capital needs, the Debtors predicate their emergence from bankruptcy on funding obtained from (a) the Exit Facility, (b) the HoldCo Loan, (c) the New Term Loan A in an aggregate principal amount of $85 million and (d) the Term Loan B in an aggregate principal amount of $400 million, $315 million of which will consist of the Term Loan converted on the Effective Date and the remainder of which will consist of Term

---

[161] *See U.S. Truck*, 800 F.2d at 589; *see also In re 203 North LaSalle St. Ltd. P'ship*, 190 B.R. 567, 594 (Bankr. N.D. Ill. 1995), *rev'd on other grounds by*, 523 U.S. 1106 (1998) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.") (quotation omitted).

[162] *See* Disclosure Statement, Exhibit C.

[163] *Id.*

[164] *See* Panagos Declaration ¶¶ 13, 14.

[165] *See* Panagos Declaration ¶ 13.

K&E 14581339.5

Loans that were previously converted into DIP Term Loans.[166]  These facilities, when consummated, will provide the Reorganized Debtors with sufficient cash—along with the Reorganized Debtors' own cash flow and certain other sources of funding—to permit the company to fund the distributions contemplated by the Plan.[167]  Amounts available under the Exit Facility, HoldCo Loan and New Term Loans will also provide the Reorganized Debtors with working capital sufficient to support their business operations.[168]

By substantially reducing the Debtors' prepetition debt, the Reorganized Debtors will be better positioned to service post-reorganization debt obligations, generate free cash flow to reinvest in their business and create value for holders of New Common Stock.[169]  Moreover, any obligations arising under the HoldCo Loan are structurally subordinated to the Reorganized Debtors' obligations under, among other things, the Exit Facility and the New Term Loan.[170]  In effect, the HoldCo Loan is, like the New Common Stock, a residual interest in the Reorganized Debtors' future performance.  Thus, the Reorganized Debtors' obligations under the HoldCo Loan will not affect the Reorganized Debtors' ability to satisfy their obligations as they come due and will not affect the feasibility of the Plan.  And, because the Debtors have continued to satisfy their obligations to unsecured creditors such as their vendors and customers in the ordinary course, they will not have to make significant cash distributions to these unsecured creditors on the Effective Date.[171]  Thus, the Plan provides for a workable scheme of reorganization, with more than a reasonable likelihood of success, and, therefore, satisfies Bankruptcy Code § 1129(a)(11).

---

[166]    *See* First Day Declaration ¶¶ 59, 61.

[167]    *See* Panagos Declaration ¶ 13.

[168]    *See id.*

[169]    *See* Panagos Declaration ¶ 14.

[170]    *See*, *e.g.*, First Day Declaration ¶ 60; Disclosure Statement Art. IV.C.5.

[171]    *See* Panagos Declaration ¶ 14.

K&E 14581339.5

### L. The Plan Provides For The Payment Of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).

Bankruptcy Code §1129(a)(12) requires the payment of all fees payable under 28 U.S.C. § 1930.[172] Article XIII.C. of the Plan provides that the Debtors will pay all such outstanding fees on or before the Effective Date. The Plan, therefore, complies with Bankruptcy Code § 1129(a)(12).

### M. The Plan Complies With Bankruptcy Code § 1129(a)(13).

Bankruptcy Code § 1129(a)(13) requires that all retiree benefits continue post-confirmation at any levels established in accordance with Bankruptcy Code § 1129(a)(13).[173] Article IV.R. of the Plan provides that on or after the Effective Date of the Plan, the payment of all retiree benefits, as defined in Bankruptcy Code § 1114, will continue in accordance with applicable law.[174] In light of the foregoing, the Plan satisfies the requirements of Bankruptcy Code § 1129(a)(13) and no party has objected to the Plan's satisfaction of this requirement.

### N. The Plan Satisfies the "Cram Down" Requirements.[175]

While two impaired classes have voted to accept the Plan, to confirm the Plan the Debtors must satisfy the Bankruptcy Code's "cram down" required as to the rejecting impaired classes pursuant to Bankruptcy Code § 1129(b).

Bankruptcy Code § 1129(b) provides that if a plan meets all applicable requirements of section 1129(a), save for section 1129(a)(8), the court may confirm the plan so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and

---

[172]   11 U.S.C. § 1129(a)(12).

[173]   11 U.S.C. § 1129(a)(13).

[174]   *See* Plan Art. IV.R.

[175]   *See* Bates Declaration ¶ 20.

interests that is impaired and has not accepted the plan.[176]  Thus, to confirm a plan that all

impaired classes have not accepted (thereby failing § 1129(a)(8)), the plan proponent must show

that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the

non-accepting impaired classes.[177]

As discussed below, the Debtors meet the requirements in Bankruptcy Code § 1129(b) to

"cram down" the Plan on the holders of Class 5 (Senior Notes Claims), Class 9 (Section 510(b)

Claims) and Class 10 (Equity Interests in Source Interlink Companies).[178]

### 1. The Plan is Fair and Equitable With Respect to the Rejecting Classes.[179]

Bankruptcy Code § § 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair

and equitable with respect to a class of impaired unsecured claims or interests if the plan

provides that the holder of any claim or interest that is junior to the claims or interests of such

class will not receive or retain under the plan on account of such junior claim or interest any

property.[180]  This central tenet of bankruptcy law — the "absolute priority rule" — requires that

if the holders of claims in a particular class receive less than full value for their claims, no

holders of claims or interests in a junior class may receive property under the plan.[181]  The

corollary of the absolute priority rule is that senior classes cannot receive more than a 100%

recovery for their claims.[182]

---

[176]  *See* 11 U.S.C. § 1129(b)(1).

[177]  *John Hancock Mut. Life Ins. Co. v. Route 37 Bus Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993).

[178]  *See* Bates Declaration ¶ 20.

[179]  *See id.*

[180]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).  Bankruptcy Code § 1129(b)(2)(A), which sets forth the absolute priority rule as to secured claims, is not applicable here because the Class 2 Second Lien Debt Claims voted to accept the Plan.

[181]  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (the absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (citations omitted).

[182]  *See In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).

K&E 14581339.5

The Plan satisfies the absolute priority rule with respect to all claims and interests. No junior holder of a claim or interest will receive any distribution unless the holders of higher priority claims receive the full value of their claims or the holders of such higher priority claims have consented to such treatment. While the Plan provides for a full recovery for holders of Class 6 (General Unsecured Claims), the holders of the impaired classes of Class 4 (Term Loan Claims) have consented to receive their respective treatment under the Plan. Moreover, Holders of Class 5 (Senior Notes Claims) are in fact the Debtors' prepetition lenders and have consented to the recoveries provided to Holders of Class 6 (General Unsecured Claims). Although the holders of Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests in Source Interlink Companies) will receive no recovery under the Plan on account of such claims and interests there are no claims or interests junior to the Class 9 (Section 510(b) Claims) and the Class 10 (Equity Interests in Source Interlink Companies)—let alone a class that is receiving any recovery on account of such claims or interests. Accordingly, the Plan satisfies the requirements of Bankruptcy Code § § 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) for all classes of claims and interests and, therefore, is fair and equitable.

### 2. The Plan Does not Unfairly Discriminate With Respect to the Rejecting Classes.[183]

The Plan does not discriminate unfairly with respect to the impaired class that has rejected the Plan. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[184] Rather, courts typically examine the facts and circumstances of

---

[183]    *See* Bates Declaration ¶ 21.

[184]    *See 203 N. LaSalle*, 190 B.R. at 585 (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established").

the particular case to determine whether unfair discrimination exists.[185]  At a minimum, however,

the unfair discrimination standard prevents creditors and interest holders with similar legal rights

from receiving materially different treatment under a proposed plan without compelling

justifications for doing so.[186]

Here, the Plan's treatment of claims and interests is proper, as similarly-situated creditors

will receive substantially similar treatment irrespective of class.  A threshold inquiry to assessing

whether a proposed plan of reorganization unfairly discriminates against a dissenting class is

whether the dissenting class is equally situated to the class allegedly receiving more favorable

treatment.  First, because the holders of the Class 4 (Term Loan Claims), as a class, have

accepted their treatment under the Plan, it is unnecessary to "cram down" any holders of these

claims.  Second, although the holders of Class 5 (Senior Notes Claims) are entitled to receive no

distribution under the Plan, these creditors are identical to holders of Class 4 (Term Loan

Claims) and have negotiated for and accepted the treatment provided by the Plan.[187]  Third, the

Plan treats holders of Class 9 Section 510(b) Claims and Class 10 Equity Interests in Source

Interlink Companies equally:  Holders of Class 9 (Section 510(b) Claims) and Class 10 (Equity

Interests in Source Interlink Companies) will receive nothing under the Plan on account of such

claims and interests.[188]  Thus, the Plan does not unfairly discriminate with respect to impaired

classes and the Plan satisfies the cram down test.

---

[185]   *See In re Bowles,* 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[186]   *See, e.g., In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[187]   *See supra* note 4.

[188]   *See* Plan Art. III.B.

### O. The Technical Amendments Do Not Materially and Adversely Affect Any Holders of Claims.

The Plan and the Disclosure Statement contain certain technical and conforming changes made to reflect (a) the HoldCo structure described in the Plan Supplement and (b) modifications to the list of documents contained in the Plan Supplement. These technical amendments are non-material modifications to the Plan pursuant to Bankruptcy Code § 1127 and Bankruptcy Rule 3019 that do not materially and adversely affect the treatment of Claims or Interests (including principally, the treatment of Class 4 (Term Loan Claims), the only class entitled to vote on the Plan) and, therefore, do not require resolicitation.[189] The Term Loan Administrative Agent, acting on behalf of the Holders of Class 4 Claims, was fully engaged in discussions regarding and supports these technical amendments. Further, Holders of Class 4 Claims were aware of these amendments and have not objected to them.

## III. RESPONSES TO OBJECTIONS.

The Debtors received seven formal objections to the Plan and two informal objections, including an informal objection from the United States Trustee. The Debtors have resolved certain of these objections as described more fully below. Notably, the Debtors have resolved the objection of the United States Trustee to the Plan. The Debtors believe that other than the objection asserted by an ad hoc committee of the Debtors' equity holders, the Debtors likely will be able to consensually resolve the outstanding objections to the Plan prior to the Confirmation Hearing. The Debtors respectfully request that, to the extent the Debtors are unable to resolve any of these outstanding objections consensually, the Court approve the Debtors' proposed resolutions described below and overrule such objections. The Debtors will address the

---

[189] *See In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (holding that resolicitation is required only where modifications materially and adversely affect voting creditors).

assertions made by the ad hoc committee of equity holders in a separate response to be filed with the Court.

A.   **Resolved Objection of the United States Trustee (the "U.S. Trustee").**

The U.S. Trustee objected to the Plan, asserting that the Debtors should not have exclusive authority to object to Fee Claims and that the Debtors' former directors should not obtain a release under the Plan.  The U.S. Trustee also asserted that third parties should not be enjoined from asserting their recoupment rights or limited in their setoff rights.  The Debtors revised the Plan to address the U.S. Trustee's objections.  In particular, the Debtors have revised Article VII.A. of the Plan to allow any party in interest to object to Fee Claims and have removed former directors from the definition of Debtor Releasees.  Additionally, the Debtors have removed the reference to recoupment rights from Article VIII.H. of the Plan and removed the limitation to setoff rights that was contained in Article VIII.I of the Plan.  With these revisions, the Debtors believe they have resolved the U.S. Trustee's objection to the Plan.

B.   **Resolved Objection of Realty Fund VIII, L.P. ("Realty Fund").**

Realty Fund filed an objection to the Plan requesting that the Debtors affirm their obligation to cure any defaults in connection with assuming the Debtors' lease with Realty Fund [Docket No. 161].  The Debtors have resolved Realty Fund's objection by providing unequivocal language to Realty Fund set forth in paragraph 56 of the proposed Confirmation Order (filed contemporaneously herewith) that affirms the Debtors' cure obligations in connection with any assumption of the Debtors' lease with Realty Fund.

C.   **Resolved Objection of Maureen Linehan ("Linehan").**

Linehan filed an objection to the Plan asserting that the Plan enjoins and unfairly prejudices Linehan's rights with respect to a Florida state court action commenced by Linehan against the Debtors prior to the Petition Date [Docket No. 176].  The Debtors have resolved

Linehan's objection by providing unequivocal language to Linehan set forth in paragraph 57 of the proposed Confirmation Order that allows Linehan to retain her rights with respect to the Florida state court action.

**D.  Resolved Objection of Westchester Fire Insurance Company and ACE USA (collectively, "ACE").**

ACE filed a limited objection to the Plan pursuant to which it asserts the Debtors may not assume or assign the Debtors' surety bond or indemnity agreement with ACE [Docket No. 180]. ACE has requested that the Reorganized Debtors enter into a new indemnity agreement with ACE and maintain the letter of credit that secures the surety bond.  The Debtors have agreed to comply with this request and, accordingly, have resolved ACE's Plan objection.

**E.  Outstanding Objection of eVox Productions, LLC ("eVox").**

eVox filed an objection to the Plan asserting that the Plan enjoins and unfairly prejudices eVox's rights with respect to copyright infringement actions eVox's alleges it may have against the Debtors [Docket No. 174].  The Debtors propose to allow eVox to retain their rights with respect to the alleged copyright infringement actions.  The Debtors have provided unequivocal language to that effect to eVox to be inserted into the Confirmation Order.  The Debtors believe that this proposed language effectively resolves eVox's Plan objection and, therefore, such objection should be overruled.

**F.  Outstanding Objection of BTR Hampstead, LLC ("BTR").**

BTR raised an informal objection to the Plan asserting that the Plan enjoins and unfairly prejudices BTR's rights with respect to its Maryland state court action involving the Debtors. The Debtors propose to allow BTR to retain its rights with respect to this state court action.  The Debtors have provided unequivocal language to that effect to BTR be inserted into the

Confirmation Order. The Debtors believe that this proposed language effectively resolves BTR's Plan objection and, therefore, such objection should be overruled.

### G. Outstanding Objection of the Internal Revenue Service (the "IRS").

The IRS filed an objection to the Plan under which it asserts that the IRS should not be subject to the bar date for filing priority tax claims proposed in the Plan unless and until the Debtors' file their federal tax returns [Docket No. 160]. The IRS further asserts that its rights should not be enjoined or impaired on account of the Plan's release and injunction provisions and objects to the treatment of the IRS's priority tax claims and the application of the automatic stay as set forth in the Plan to the extent it extends beyond the period provided for by Bankruptcy Code § 362.

The Debtors propose to allow the IRS to retain its rights with respect to its tax claims and will pay any priority tax claims in a timely and mutually agreed upon manner. The Debtors also agree that the IRS shall not be precluded from filing priority tax claims against the Debtors if the Debtors have not filed their federal tax returns with the IRS prior to the priority tax claims bar date. The Debtors believe that their proposed resolution effectively resolves the IRS's Plan objection, which the Debtors respectfully submit should be overruled.

### H. Outstanding Objection of SINV, LLC, SINV II, LLC and BFG Holdings 2000, LLC (collectively, "SINV").

SINV filed an objection to the Plan asserting that the Plan's release, substantive consolidation and certain other provisions unfairly enjoin and impair SINV's rights to assert certain claims against one of the Debtors' predecessor entities and its stockholders and directors (collectively, the "Source Parties") related to SINV's leases with the Debtors [Docket No. 166].

K&E 14581339.5

By motion filed on the Petition Date, the Debtors seek to reject their leases with SINV.[190]  The Debtors propose not to pose an objection to any rejection damages or other claims asserted by SINV with respect to SINV's leases based upon of substantive consolidation under the Plan. (The Debtors' right to object, defend or counterclaim on any other grounds is reserved.)  Further, the Debtors propose to allow SINV to retain its rights to claims it may have against the Source Parties with respect to the allegations SINV raises in its Plan objection.  The Debtors respectfully submit that their proposed resolution effectively resolves SINV's Plan objection and, therefore, such objection should be overruled.

*     *     *     *     *     *

---

[190] *See Debtors' Motion for Entry of Order Authorizing the Debtors to Reject Certain Unexpired Leases Nunc Pro Tunc to the Petition Date* [Docket No. 13].

K&E 14581339.5

## <u>CONCLUSION</u>

For the reasons set forth herein, the Debtors submit that the Disclosure Statement, the solicitation procedures, the Ballots and the Plan fully satisfy all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Court and applicable non-bankruptcy law and respectfully request that the Court enter an order: (a) approving the Disclosure Statement, solicitation of votes and voting procedures and forms of Ballots; (b) confirming the Plan; and (c) granting such other and further relief as is just and proper.

Wilmington, Delaware
Dated: May 26, 2009

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:     ljones@pszjlaw.com
          tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (admitted *pro hac vice*)
David A. Agay (admitted *pro hac vice*)
Paul Wierbicki (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     david.eaton@kirkland.com
          david.agay@kirkland.com
          paul.wierbicki@kirkland.com

Co-Counsel to the Debtors and
Debtors in Possession